PRAIRIE OIL & GAS CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).

(Commerce Court, March 11, 1913.)

Nos. 75–80.

**1.** CARRIERS (§ 25*)—INTERSTATE COMMERCE ACT—PIPE LINE AMENDMENT—CONSTRUCTION.

The amendment of section 1 of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379) by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1911, p. 1284), by providing that the act shall apply "to any corporation or any person or persons engaged in the transportation of oil, * * * by means of pipe lines, * * * who shall be considered and held to be common carriers within the meaning and purpose of this act," is not ambiguous, and was clearly intended to make common carriers of, and subject to the provisions of the act, all owners of interstate oil pipe lines, regardless of their previous status, and although they had never been in fact common carriers, but their lines were used solely for the transportation of their own oil in carrying on their private business.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 25;* Commerce, Cent. Dig. § 81.]

**2.** COMMERCE (§ 33*)—CONSTITUTIONAL LAW (§ 297*)—MINES AND MINERALS (§ 86*)—INTERSTATE COMMERCE ACT—PIPE LINE AMENDMENT—CONSTITUTIONALITY.

The purpose and effect of the amendment as applied to such a pipe line is to impose upon what was previously a strictly private business public duties as a common carrier, and to convert by force of law a corporation owner, which was before a private corporation, into a public service corporation, and compel it to devote its property to a public use without its consent. In so providing Congress exceeded even the broad powers conferred upon it by the commerce clause of the Constitution, and the amendment as applied to such owners is void, as depriving them of their property without due process of law, by depriving them of its beneficial use and enjoyment.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 81; Dec. Dig. § 33;* Constitutional Law, Cent. Dig. §§ 832–834; Dec. Dig. § 297;* Mines and Minerals, Cent. Dig. §§ 216–221; Dec. Dig. § 86.*]

**3.** COMMERCE (§ 33*)—CONSTITUTIONAL LAW (§ 297*)—MONOPOLIES (§ 16*)—INTERSTATE COMMERCE ACT—PIPE LINE AMENDMENT—CONSTITUTIONALITY.

Such amendment cannot be upheld as imposing, as a condition to the right of owners of pipe lines to transport their own oil from one state into another, that they become common carriers and transport oil for the public, such right being inherent, and not derived from legislation; nor as a valid regulation to prevent monopoly, since the transportation by a private owner of his own oil from the fields of production to refineries or distributing points has no natural tendency to create a monopoly.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 81; Dec. Dig. § 33;* Constitutional Law, Cent. Dig. §§ 832–834; Dec. Dig. § 297;* Monopolies, Cent. Dig. § 12; Dec. Dig. § 16.*]

**4.** CARRIERS (§ 4*)—WHO ARE COMMON CARRIERS—PRIVATE PIPE LINES.

The fact that private pipe lines may be laid across, or in some instances along, public highways, with the consent of the local authorities, or along the right of way of interstate railroads, with the consent

of the railroad companies, does not impress upon them any obligation to become common carriers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1, 462-478; Dec. Dig. § 4.*]

5. COMMERCE (§ 1*)—REGULATION OF INTERSTATE COMMERCE—POWER OF CONGRESS.

Where Congress is without the power under the Constitution to enact and enforce a law as a regulation of interstate commerce, it cannot derive such powers from a state enactment.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 1, 2; Dec. Dig. § 1.*]

6. CARRIERS (§ 4*)—WHO ARE COMMON CARRIERS—PIPE LINE COMPANIES.

That pipe line companies building interstate lines on private rights of way were incorporated as common carriers in the states of their organization did not make them such in other states, whose statutes do not provide for the incorporation of common carrier pipe line companies, nor prevent them from selling their lines in such other states, and the purchaser had the right to acquire and use them exclusively in its private business, especially where they had never in fact been used otherwise than as private carriers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1, 462-478; Dec. Dig. § 4.*]

Mack, Judge, dissenting.

Separate petitions by the Prairie Oil & Gas Company, by the Uncle Sam Oil Company, by Robert D. Benson and others, by the Ohio Oil Company, by the Standard Oil Company, and by the Standard Oil Company of Louisiana against the United States of America; the Interstate Commerce Commission intervening in each case. On motions for preliminary injunction. Motions granted.

For opinion of the Interstate Commerce Commission, see 24 I. C. C. Rep. 1.

W. S. Fitzpatrick and J. B. F. Cates, both of Independence, Kan. (L. W. Keplinger and C. W. Trickett, both of Kansas City, Kan., on the brief), for Prairie Oil & Gas Co.

Albert L. Wilson, of Kansas City, Mo., for Uncle Sam Oil Co.

W. I. Lewis, of New York City (Arch. F. Jones and R. R. Lewis, both of Coudersport, Pa., and Clarence A. Farnum, of St. Petersburg, Fla., on the brief), for Tide Water Pipe Co., Limited.

John G. Milburn, of New York City (Frank L. Crawford and Walter F. Taylor, both of New York City, on the brief), for Ohio Oil Co.

John G. Milburn, of New York City (M. F. Elliott and Chester O. Swain, both of New York City, on the brief), for Standard Oil Co. and Standard Oil Co. of Louisiana.

Winfred T. Denison, Asst. Atty. Gen., and Blackburn Esterline, Sp. Asst. Atty. Gen. (Thurlow M. Gordon, Sp. Asst. Atty. Gen., on the brief), for the United States.

Charles W. Needham, of Washington, D. C., for Interstate Commerce Commission.

Before KNAPP, Presiding Judge, and HUNT, CARLAND, and MACK, Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

KNAPP, Presiding Judge. By an amendment approved June 29, 1906, which took effect 60 days thereafter, the provisions of the act to regulate commerce were extended and made to apply *"to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water,* * * * *who shall be considered and held to be common carriers within the meaning and purpose of this act.* * * *"*

Subsequently, in June, 1911, the Interstate Commerce Commission on its own motion instituted a proceeding, "In the Matter of Pipe Lines," No. 4,199, to which numerous companies using pipe lines for the transportation of oil, including the several petitioners above named, were made parties respondent. The stated purpose of this inquiry was to determine whether any of the rates, regulations, or practices of the respondents, or either of them, were unreasonable or discriminatory, or otherwise in violation of the act, and to ascertain the manner and method in which their business was carried on, matters respecting which, as the order recites, complaint had been made to the Commission.

During the following months an extended investigation appears to have been conducted, which presumably disclosed, among other things, the principal facts relating to the location, extent, ownership, and activities of the various pipe lines of the respondent companies. After the taking of testimony was concluded, and in the order or notice fixing May 10, 1912, as the date for final hearing, certain questions of law were propounded by the Commission, and it is assumed that these questions were discussed when the matter was argued and submitted. Afterwards, and on June 3, 1912, the Commission made and filed its report of the proceeding, as required by law, and thereupon entered an order in and by which 13 of the respondents therein specified, including the above-named petitioners, were notified and required "to file with this Commission, on or before the 1st day of September, 1912, schedules of their rates and charges for the transportation of oil, in compliance with the provisions of the act to regulate commerce." (The effective date was subsequently postponed for a period which has not yet expired.)

Shortly thereafter the above-entitled suits were brought to set aside and annul this order, the several petitioners basing their right to such relief upon grounds which will presently be stated. The United States filed an answer to each suit, but later withdrew its answer in No. 75, the Prairie Oil & Gas Company Case, and substituted a motion to dismiss for want of equity. In No. 77 the Wellsville Refining Company intervened by leave of the court and prayed that the petition be dismissed, and in No. 78 there was a like intervention by the Cornplanter Refining Company. The Interstate Commerce Commission answered at length in each of the cases. Upon the verified petitions filed by them, respectively, and supporting affidavits the petitioners applied for injunctions pendente lite, and the cases have been argued and submitted on such applications.

Whilst each case differs from the others in various particulars, and perhaps in respects which would be important in other connections, the fundamental questions here involved are common to them all and arise out of facts which are practically undisputed. The crude or natural oil produced in the United States is found in various sections of the country, described as "fields," which are of comparatively limited area and located at considerable distances from each other. The most important of these appear to be the Appalachian field, covering parts of the states of New York, Pennsylvania, West Virginia, southeastern Ohio, Kentucky, and Tennessee; the Lima-Indiana and Illinois fields, covering parts of northwestern Ohio, Indiana, and Illinois; the mid-continent field, covering parts of the states of Kansas and Oklahoma; the Gulf field, covering parts of the states of Louisiana and Texas; the Caddo field in Louisiana and Texas; and other fields in the states of California, Colorado, Wyoming, Michigan, and Missouri. In each of these fields there are hundreds and perhaps thousands of wells from which the crude oil is obtained, and the aggregate output amounts to upward of 200,000,000 barrels per annum.

The oil in its natural state is not well suited to domestic use, and therefore requires a process of refining to prepare it for the needs of consumers. It is inferable from the record that the business of refining crude oil can be profitably conducted only on a large scale and by means of somewhat costly plants, and therefore the number of refineries is comparatively small. These refineries are located for the most part at considerable distances, and sometimes at great distances, from the fields of production, and the customary method of transporting the crude oil to the refinery is by means of pipe lines. The cost of transporting by this method is said to be not more than 25 to 35 per cent. of the cost by any other agency, and it results that practically all the crude oil produced is moved by pipe lines to the various refineries. There are many thousands of miles of pipe lines now in use, and their operations are correspondingly extensive. Some of these pipe lines, aggregating a large mileage, are admittedly subject to public regulation, because their owners are public service corporations engaged in the business of common carriers; but many of them belong to private companies, which use them only in the conduct of their private business. The private lines in most instances are owned or controlled by the refineries to which they transport crude oil and which they exclusively serve.

The construction of pipe lines, such as are owned by these petitioners, involves a large outlay of capital, and few producers of the crude article are able to provide themselves with such a facility for marketing their output. Consequently, and because the cost of railroad transportation is prohibitive, the great majority of oil producers find it to their interest to sell at the wells to the owners of pipe lines, and, as a practical matter, may have no other alternative. For this reason it comes to pass that these private pipe line companies transport not only the oil supplied by their own wells, but also the much greater amount purchased by them from other producers. In the view we take of the questions involved in this controversy, and the

204 F.—51.

grounds upon which we rest our decision, it is deemed unnecessary to describe the pipe line industry in greater detail or to add anything more in this connection than a brief statement respecting the several petitioners.

The Prairie Oil & Gas Company is a corporation organized in 1900 under the laws of the state of Kansas. It owns and operates a system of pipe lines consisting of gathering lines in the mid-continent field, in the states of Kansas and Oklahoma, a trunk line from that field to Griffith in the state of Indiana, where it connects with the Indiana pipe line, and a trunk line in the state of Arkansas, connecting the Oklahoma pipe line with the pipe line of the Standard Oil Company of Louisiana. This company has no refinery, and its business is confined to producing, purchasing, and selling crude oil, which it delivers to its customers by means of the pipe lines described. Its own wells yield only about 12,000 barrels per day, and it purchases approximately 70,000 barrels per day on the average. Its trunk lines are about 860 miles in length, of which some 300 miles are located on the right of way of the Atchison, Topeka & Santa Fé Railway Company under contract arrangement with that company.

The Uncle Sam Oil Company is a corporation organized in 1905 under the laws of the state (then territory) of Arizona. It owns and operates a pipe line from its wells in the state of Oklahoma to its refinery at Cherryvale, Kan. The extent to which this company purchases oil from other producers, if it engages in that business at all, does not appear from the record.

Robert D. Benson et al. are the members of a partnership, organized in 1878 for the term of 20 years, and reorganized in 1898 for a further term of 20 years, in compliance with the laws of the state of Pennsylvania, and doing business under the name of the Tide Water Pipe Company, Limited. This company transports oil from the Appalachian field in the western part of Pennsylvania, and also oil received through connecting lines from other fields, to the Tide Water Oil Company refinery at Bayonne, in the state of New Jersey. It also owns and operates branch lines in New York and Pennsylvania, and a line extending from Stoy, Ill., through the states of Illinois, Indiana, Ohio, and Pennsylvania. The greater part of the crude oil transported by this company is purchased from other producers. The lines which it owns and the Bayonne refinery which it serves are under common or unified control.

The Ohio Oil Company is a corporation organized in 1887 under the laws of the state of Ohio. It owns and operates pipe lines in the states of Ohio, Indiana, and Illinois, and also leases and operates a line from Negley, Ohio, to Centerbridge, in the state of Pennsylvania. It is an extensive purchaser of crude oil from other producers.

The Standard Oil Company, designated, for convenience, "Standard Oil Company of New Jersey," is a corporation organized in 1882 under the laws of the state of New Jersey, and its principal pipe lines are the following: (a) A line extending from Unionville, in the state of New York, near the boundary line of New Jersey, through the

latter state to its refineries at Bayonne; (b) a line from Centerbridge, in the state of Pennsylvania, near the boundary of New Jersey, through the latter state to its refineries at Bayonne and Bayway; and (c) a line from Fawn Grove, in the state of Pennsylvania, near the boundary of Maryland, through the latter state to its refinery at Baltimore. The record indicates that much the greater part of the oil transported through these lines, and perhaps all of it, is oil which this company has purchased.

The Standard Oil Company of Louisiana is a corporation organized in 1909 under the laws of that state. It owns and operates a refinery at Baton Rouge and a trunk line extending thereto from the town of Ida, near the northern line of Louisiana, and also gathering lines in the Caddo field, in the states of Louisiana and Texas. It purchases a considerable part of the crude oil which its lines transport.

None of the petitioning corporations is organized or derives any of its corporate powers from laws of the state of its creation under which common carrier or other public service corporations are organized, but each of them was formed and has always conducted its operations under and in compliance with state laws which relate to private as distinguished from public business. With certain alleged exceptions, which will be hereafter noticed, it is not claimed that either of the petitioners is under any statutory or legal obligation, other than the amendment in question, to perform the duties or otherwise act in the capacity of a common carrier. None of the petitioners possesses the right of eminent domain or has acquired any part of its property or rights of way by condemnation; nor has either of them received a franchise from any state, municipal, or local government, though each of them has in many instances laid its pipe lines across or along public streets and highways by permission or consent of the local authorities. None of them has ever held itself out as a common carrier or in fact carried oil for others, but each of them has carried only such oil as it produced from its own wells or purchased from other producers, and which it owned when the transportation took place. The pipe lines of petitioners are laid on private rights of way secured by purchase or lease, except that some of them for short distances, and one of them for a distance of some 300 miles, are laid upon and along the rights of way of certain railroads under some contract arrangement with such railroads. In short, so far as their legal status is fixed by the laws of the states of their creation, and so far as their acts and attitude could make them such, all the petitioners carry on a private business, at least in the sense that they transport only their own oil and have always refused to transport for others; and all of them have evidently sought and claimed to so conduct their operations as to avoid any public activity which might subject them to public regulation. Some other facts relating to certain of the petitioners will be referred to in the following discussion of the legal questions to be decided.

The petitioners rely upon two propositions:

1. That the amendment of 1906 applies only to such pipe line companies as were common carriers when the amendment was adopted,

or should thereafter become such by voluntary action, or be so declared in some judicial proceeding, and, consequently, that as to these petitioners·the order in question should be set aside because they are not and never have been common carriers, and therefore are not subject to the provisions of the act or the authority of the Commission.

2. That if the amendment applies literally to all persons and corporations using pipe lines for the interstate transportation of oil, and Congress has thereby undertaken to bring within the scope of the act persons and corporations owning private pipe lines used solely for transporting their own oil in the conduct of their private business, the amendment is unconstitutional, because it deprives such persons and corporations of their property without due process of law and takes their property for public use without just compensation, and the order should be set aside for that reason.

[1] We shall not attempt to review at length the argument by which the first proposition is supported, but merely outline the reasons advanced for giving to the amendment a restricted application. Among other things it is said that the entire scope and aim of the act is the regulation of the charges and practices of common carriers; that its provisions are designed and adapted to that purpose, and are not suited to a different purpose; that the intention to bring within such a law persons and corporations carrying on a private business should not be imputed to Congress, if the amendment is reasonably susceptible of a construction in harmony with the other provisions of the regulating statute; and that the language of the amendment justifies such a construction.

In this connection it is argued that the words "engaged in transportation" are equivalent to and mean "engaged in the *business* of transportation"; that this indicates a calling or occupation which is followed for hire, implying transactions and relations between two or more persons, and does not embrace that which one does for himself and by himself alone. It would seem to follow from this interpretation, and the petitioners so contend, that the concluding phrase of the amendment, "who shall be considered and held to be common carriers within the meaning and purpose of this act," limits the preceding declaration respecting the users of pipe lines, and operates to confine the amendment to such persons and corporations as are in fact common carriers or may be adjudged to be such by a court of competent jurisdiction. Stress is also laid upon the word "transportation," which later in the first section is given a broad definition, including "all instrumentalities and facilities of shipment or carriage, * * * and all services in connection with the receipt, delivery, * * * storage, and handling of property transported," terms which are claimed to relate exclusively to the functions of common carriers and to have no application to those who transport only·their own property in the conduct of their private business.

These considerations are sought to be fortified by invoking the familiar principle that where a statute permits of two constructions, one of which involves serious questions of constitutional power and right, while the other would be free from constitutional objection,

the latter should be adopted. Numerous cases illustrating and enforcing this principle are brought to our attention, of which one of the latest is the well-known "Commodities Case," United States v. Delaware & Hudson Company, 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836. Upon these authorities the contention is earnestly pressed that the amendment should be held to apply to only such pipe line companies as are or may be adjudged to be common carriers, because the broader construction upon which the government insists, and which would in effect extend the amendment without limitation or qualification to all persons and corporations engaged in the interstate transportation of oil by means of pipe lines, including those who use this means solely for transporting their own oil over their privately acquired rights of way, necessarily gives rise to "grave and doubtful constitutional questions" (213 U. S., supra), and perhaps to "a succession of constitutional doubts," as was suggested in the Harriman Case, 211 U. S. 422, 29 Sup. Ct. 119, 53 L. Ed. 253.

That the argument thus summarized is not without force may be conceded. The objection to its acceptance does not arise from any doubt concerning the rule of interpretation invoked, for that rule is well settled, but rather from the lack of any substantial basis for its application. It is only when a statute is ambiguous or obscure, or wanting in definiteness, so that its real intent and meaning are uncertain, because the language permits differing interpretations, that the rule in question may be applied. If the legislation is clearly expressed and of unmistakable import, so that there is no room for reasonable doubt as to what the lawmaking body intended to accomplish, the courts are not at liberty to frustrate or modify the legislative intention, but must accept and deal with the statute in accordance with the manifest purpose which it expresses.

To our apprehension the meaning of this amendment is not open to serious question. It is a clear and comprehensive declaration, in no respect indefinite or incomplete. The concluding phrase is not a limitation or restriction, but, on the contrary, was plainly inserted for the purpose of fixing the legal status of the persons and corporations included in precise terms in the preceding description, to the end that they should be regarded and treated as common carriers subject to the act by all officials who are or may be charged with the administration and enforcement of the regulating statute. In our judgment the amendment permits of no other or different construction, and we must therefore accept it as a plain and unambiguous measure, designed to effect a complete and definite purpose.

In support of this view we need cite only the first "Employers' Liability Cases," 207 U. S. 463, 500, 28 Sup. Ct. 141, 146 (52 L. Ed. 297). It seems evident to us that the statute then under consideration was not clearer or plainer than is the amendment in question, nor were its terms any more comprehensive and unqualified. To uphold the constitutionality of that enactment the government stoutly contended that it should not be construed as applying to all the employés of any common carrier engaged in interstate commerce, although all were included in the language defining its scope, but should be held

to embrace only such employés as were, or when they were, themselves engaged in interstate commerce; and this view is reflected in the dissenting opinion of Mr. Justice Moody. But a majority of the court, speaking through Mr. Justice (now Chief Justice) White, rejected the argument in an opinion from which the following is quoted:

"So far as the face of the statute is concerned, the argument is this: That because the statute says carriers engaged in commerce between the states, etc., therefore the act should be interpreted as being exclusively applicable to the interstate commerce business and none other of such carriers, and that the words 'any employé,' as found in the statute, should be held to mean any employé when such employé is engaged only in interstate commerce; but this would require us to write into the statute words of limitation and restriction not found in it. * * * To write into the act the qualifying words, therefore, would be but adding to its provisions in order to save it in one aspect, and thereby to destroy it in another. * * * The principles of construction invoked are undoubted, but are inapplicable. Of course, if it can be lawfully done, our duty is to construe the statute so as to render it constitutional; but this does not imply, if the text of an act is unambiguous, that it may be rewritten to accomplish that purpose."

So far as the debates in Congress when this amendment was pending may be resorted to for any purpose, they tend strongly to confirm the conclusion above expressed. We are convinced from an examination of what was then said, particularly in the Senate, that Congress undertook and intended by this amendment to make common carriers of and to subject to the provisions of the act as such the owners of private pipe lines, who were not common carriers, and who used their respective pipe lines, and had always used them, solely for the transportation of their own oil, in carrying on their private business; and it is equally clear that Congress enacted the amendment with full knowledge that the question of its constitutionality was involved. In short, we agree with the Commission in what is said in the following excerpts from its report in the pipe line proceeding:

"This seems to be the plain meaning of the act, that all pipe lines carrying oil from one state to another state, no matter what their previous status, should be thenceforward considered and deemed to be common carriers. And, to uphold this construction, reference may be made to the history of this provision. * * * Throughout the discussion there is abundant evidence that Congress passed this act for the purpose of subjecting all interstate pipe lines carrying oil to federal regulation, and took this action consciously, in the presence of the very constitutional question now raised as to its power."

[2] Rejecting, therefore, the first proposition above stated, and holding that the amendment in question applies to the petitioners in these cases, in common with other pipe line companies of like character and business, we come to consider the second proposition. Does this amendment, construed in accordance with the government's contention, which we uphold, exceed the constitutional power of Congress? Would its enforcement invade or take away rights secured to the petitioners by the fifth amendment?

Of the plenary power of Congress to regulate interstate commerce nothing need be said beyond giving it full and complete recognition. That this power may be exercised to the utmost extent, and acknowledges no limitations other than those prescribed in the Constitution it-

self, is established beyond question by a notable line of cases, from Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, decided in 1824, to the latest utterance of the Supreme Court upon the subject. But it is equally well established by numerous decisions that the limitations prescribed are positive and controlling. The same authority that grants the power fixes also the limits within which the exertion of that power must be confined. If, therefore, Congress passes a law which disregards those limits, as by depriving the owners of property of rights which the Constitution protects against invasion, the legislation cannot be upheld, and it becomes the duty of the courts to stay its enforcement.

As was said by Mr. Justice Brewer in Monongahela Navigation Company v. United States, 148 U. S. 336, 13 Sup. Ct. 630, 37 L. Ed. 463:

"But like the other powers granted to Congress by the Constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the fifth amendment. * * * Congress has supreme control over the regulation of commerce; but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this fifth amendment, and can take only on payment of just compensation."

And in Adair v. United States, 208 U. S. 180, 28 Sup. Ct. 283, 52 L. Ed. 436, 13 Ann. Cas. 764, the Supreme Court, speaking by Mr. Justice Harlan, used the following language:

"We need scarcely repeat what this court has more than once said, that the power to regulate interstate commerce, great and paramount as that power is, cannot be exerted in violation of any fundamental right secured by other provisions of the Constitution. Gibbons v. Ogden, 9 Wheat. 1, 196 [6 L. Ed. 23]; Lottery Case, 188 U. S. 321, 353 [23 Sup. Ct. 321, 47 L. Ed. 492]."

In attempting to apply these basic principles to the question now presented, we are led to observe at the outset the real significance of this amendment as disclosed by the intention with which it was enacted and the purpose which it seeks to accomplish. It does not undertake to regulate the business in which these private pipe line companies are and always have been engaged. Indeed, it assumes that the legal status of such companies, under the laws of the states of their creation and tested by the nature of their activities, was that of persons pursuing a private occupation; and it attempts by a legislative declaration to make that private occupation a public calling and to impose upon those who pursue it the duties and obligations of common carriers. Before the law was enacted their business was private; by force of the law itself that business is made public. Nothing which they were then doing is subjected to regulation, but they are in effect commanded to do something else which would be of public concern; and by simply declaring them to be common carriers they are made to devote their property to public use against their will and under the regulations prescribed by the act. Thus the owner of a private pipe line which was built upon private rights of way, and which has been used solely for the transportation of his own oil, is required to open and extend its use to whomsoever may desire its enjoyment, no matter with what resulting inconvenience and injury to himself.

And this is concededly the intent and purpose of the amendment. It is not designed to regulate some public use to which private property has been voluntarily devoted, but it attempts by an act of legislation to transmute the agencies of private business into instrumentalities of public service. In aim and necessary effect it compels these private pipe line companies to relinquish the exclusive use for which their pipe lines were provided, and in which they have always been employed, and to place them at the disposal, for a compensation which public authority would have the right to determine, of all such persons as might tender oil for transportation. When the principle involved· in this amendment is apprehended, when its far-reaching scope and power are perceived, does not the reflecting mind almost instinctively reject it as unsound and unjust? Is it not at variance with any reasonable conception of the rights and immunities of private property and the conditions under which it may be taken for public use? How can the conclusion be avoided that it operates and must operate to deprive the petitioners of their property without due process of law and to take that property without just compensation?

Upon principle and authority it is not to be doubted, and counsel for the government do not contend otherwise, that to effect an invasion of the rights protected by the fifth amendment it is not necessary that the actual physical possession of property should be taken. It is sufficient if the owner be deprived of its exclusive use and enjoyment. This proposition is broadly stated by the Court of Appeals of New York in Forster v. Scott, 136 N. Y. 577, 32 N. E. 976, 18 L. R. A. 543, in the following language:

"What the Legislature cannot do directly it cannot do indirectly, as the Constitution guards as effectually against insidious approaches as an open and direct attack. Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value without legal process or compensation, it deprives him of his property within the meaning of the Constitution. All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must in terms or in effect authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment or the power of disposition ·at the will of the owner."

And in Weems Steamboat Co. v. People's Co., 214 U. S. 345, 355, 29 Sup. Ct. 661, 663 (53 L. Ed. 1024, 16 Ann. Cas. 1222), the Supreme Court gives the principle concrete application, as follows:

"A private wharf on a navigable stream is thus held to be property which cannot be destroyed or its value impaired, and it is property the exclusive use of which the owner can only be deprived in accordance with established law, and if necessary that it or any part of it be taken for the public use due compensation must be made. The owner of a private wharf on a navigable stream does not, on that account only, hold it by a different title from the owner of any other property which he may use himself or permit others whom he may select to use, while at the same time denying its use by any one else."

And this suggests the clear distinction between the question here presented and the questions decided in a number of well-known cases,

all of kindred character, such as Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247, Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757, and Cotting v. Kansas City Stock Yards, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92. Nor did the earliest of these, Munn v. Illinois, establish any new principle of law, but only gave effect to an old one, as the Supreme Court said in Dow v. Biedelman, 125 U. S. 680, 8 Sup. Ct. 1028, 31 L. Ed. 841. Indeed, it had long been held by the courts of England, as well as the United States, that when one devotes his property to a use in which the public has an interest he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but as long as he maintains the use he must submit to the control.

But this legislation is not of that character. None of these petitioners has at any time transported oil for others, or used its pipe lines for any other purpose than the transportation of its own oil which it had produced or purchased prior to the transportation. Nor has anything been done by them which can be claimed to effect a devotion of their property to a public use or to give the public an interest in its use, since they have always refused to carry oil for the public or to permit the use of their lines except for the transportation of their own property. The effect of the amendment is to change the nature and quality of their business from private to public, by requiring them to share with others the facilities which they have provided for themselves alone and to employ those facilities in the service of the public. In our judgment, this is something essentially different from and quite beyond the power delegated to Congress to *regulate* commerce among the states: and we are persuaded that a law which in intention and result deprives the owners of private property of its exclusive enjoyment and compels the devotion of that property to public use, in the manner attempted by this amendment, involves an exercise of legislative power in plain contravention of the fifth amendment. No federal statute of like aim and import has been brought to our attention, and no authority has been cited which sustains the validity of such legislation.

Among the cases referred to in argument, aside from those before mentioned, is Cargill v. Minnesota, 180 U. S. 452, 21 Sup. Ct. 423, 45 L. Ed. 619, which is of the same class as Brass v. North Dakota, supra, and others involving various aspects of the same general question. Without reciting the facts of that case or quoting at length from the opinion, it is sufficient to say that the Supreme Court upheld a Minnesota statute which in effect required the Cargill Company to take out a license for carrying on the business *in which it had voluntarily engaged.* It is true this company had never received into its warehouse any grain except its own, but the state court held that the warehouse in question could be fairly regarded as "a sort of public market place, where the farmers come with their grain for the purpose of selling the same, and where the purchaser, a party in

interest, acts as market master, weighmaster, inspector, and grader of the grain"; and this was deemed to be of sufficient public concern to justify the state in supervising *the business actually conducted.* The Minnesota law made no attempt to change the character of that business, nor did it seek to compel such concerns as the Cargill Company to store or handle grain for the public, or to otherwise act in the capacity of public warehousemen. Had such a requirement been imposed a very different question would have been presented. This is indicated in Brass v. North Dakota, supra, where the Supreme Court said respecting a law of that state which declared certain classes of buildings in which a warehouse business was conducted to be public warehouses:

"We do not understand this law to require the owner of the warehouse, built and used by him only to store his own grain, to receive and store the grain of others. Such a duty only arises when he chooses to enter upon the business of elevating and storing the grain of other persons for profit."

It is not necessary in these cases to consider the circumstances under which or the extent to which business activities, whether public or private, may be regulated by public authority. That is not the point in dispute. That the business of these petitioners, as it is and has been carried on, may be subjected to regulation need not be in any wise questioned. But it is one thing to exercise public control of a private business which *as such* should be placed under public supervision; it is quite another thing to require that business to be changed from private to public and compel those who are engaged in it to assume the responsibilities of a public calling.

The distinction we are here pointing out, and which seems to us controlling, is indicated in Weems Steamboat Co. v. People's Co., supra. For that reason, and because of its general bearing upon the controversy in these cases, we quote from the opinion at some length as follows:

"The case of Munn v. Illinois, 94 U. S. 113, 127, 24 L. Ed. 77, has, in our judgment, no bearing upon the question before us. In that case and in those cited therein the discussion was in regard to the right of owners of property of the nature described to charge what they pleased for the doing of the business in which they were engaged. Their property was being used with their consent by and its use devoted to the public to any extent desired, and the only question was in regard to the compensation which they were entitled to ask for the business thus done. The complaint was that the charges were too great and were a violation of a law of the state and were not reasonable, and the answer made by the owners of the property was that it was their private property, and they had the right to charge what they pleased. The court said: 'As you have devoted your property to a use in which the public has an interest, you have granted to the public an interest in that use, and the right, on the part of the state, to regulate charges which you shall make to the end that they shall be just and reasonable.' If the owner of one of these wharves had devoted it to the public use, and permitted the public to use it as it desired, and demanded compensation for such use, the question as to the amount of such compensation might be raised as in the Munn class of cases, to be determined with reference to the reasonableness of the charge. But this is no such case. The Legislature has passed no law regarding rates, if that were material, and the reasonableness of the charge is not under consideration. The right to use the property has been withdrawn by the owner as to the public in general, including defend-

ant. The only question is whether a third person has the right to use a private wharf on tendering reasonable compensation therefor, because there is no other wharf at the place, or because it would be more convenient to such third person to so use it, or because the former owner of the wharf had permitted the public to use it, although the present owner refused to consent to such use. There is no more reason why such property should be held subject to the right of others to use it against the will of its owner than there is for any other kind of property to be so held."

Without referring to other authorities in this connection, we proceed to examine the particular grounds upon which the government relies to sustain the validity of this legislation.

[3] It is argued, in the first place, that the amendment should be construed as in effect prohibiting these petitioners and other private pipe line owners from transporting their own oil from one state to another by means of pipe lines, except upon condition that they transport oil for the public and become common carriers of that commodity. This appears to have been the view of the Commission, as disclosed by the following paragraph in its report:

"So far as we are informed, the Supreme Court of the United States has never been called upon to pass upon a question of this character, and while it may be conceded that Congress could not impose upon a private pipe line the duties and responsibilities of a common carrier, it is not clear but that the provisions of this act could be upheld upon the ground that Congress was establishing a condition to which any pipe line company must conform which transported oil across a state border."

Putting aside the suggestion that neither the form nor apparent intent of the amendment supports such a construction, since in terms it prohibits nothing and does not purport to establish a condition, and granting for argument's sake that it may and should receive the interpretation here claimed for it, we are led to reject the contention because it involves an erroneous assumption. It assumes that one who engages in the dealings or activities which constitute interstate commerce is not exercising an inherent right that springs from the nature and necessities of social order, but is merely enjoying a privilege which Congress can take away if it chooses or permit on such conditions as it sees fit to prescribe. But this view, so far as we are aware, has never received judicial sanction. The contrary was held in the first case involving the meaning and scope of the commerce clause which reached the Supreme Court, Gibbons v. Ogden, supra, when Chief Justice Marshall included the following in his oft-quoted opinion (9 Wheat. page 211, 6 L. Ed. 23):

"In pursuing this inquiry at the bar it has been said that the Constitution does not confer the right of intercourse between state and state. That right derives its source from those laws whose authority is acknowledged by civilized man throughout the world. This is true. The Constitution found it an existing right, and gave to Congress the power to regulate it."

Without citing other authorities, it is sufficient to quote the forcible statement of the principle by Chief Justice White in the Employers' Liability Cases, supra, 207 U. S. 463, at page 502, 28 Sup. Ct. 141, at page 147 (52 L. Ed. 297):

"It remains only to consider the contention which we have previously quoted, that the act is constitutional, although it embraces subjects not

within the power of Congress to regulate commerce, because one who engages in interstate commerce thereby submits all his business concerns to the regulating power of Congress. To state the proposition is to refute it. It assumes that, because one engages in interstate commerce, he thereby endows Congress with power not delegated to it by the Constitution; in other words, with the right to legislate concerning matters of purely state concern. It rests upon the conception that the Constitution destroyed the freedom of commerce which it was its purpose to preserve, since it treats the right to engage in interstate commerce as a privilege which cannot be availed of except upon such conditions as Congress may prescribe, even although the conditions would be otherwise beyond the power of Congress. It is apparent that if the contention were well founded it would extend the power of Congress to every conceivable subject, however inherently local, would obliterate all the limitations of power imposed by the Constitution, and would destroy the authority of the states as to all conceivable matters which from the beginning have been, and must continue to be, under their control so long as the Constitution endures."

In the light of these decisions, nothing further need be said in this connection in answer to the argument here considered.

In the second place it is urged, and this appears to be the ground upon which the government chiefly relies, that the amendment should be upheld as a valid regulation of interstate commerce to prevent monopoly, or, as it is said, to prevent a tendency to monopolize, and therefore any incidental injury which results must be regarded as immaterial. This position is indicated by the following paragraph in the reply brief of the learned Assistant Attorney General:

"The argument that these pipe lines are not themselves monopolies within the meaning of the Sherman Act [Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200]) is wholly irrelevant. That act applies only to concerns that are already monopolies, or are attempting (*intentionally*) to monopolize. The present act is designed to go *beyond* the Sherman Act. The Sherman Act cuts down the full-grown plant. The pipe-line amendment pulls up the roots from which it grew. It does not prohibit the private operation of these pipe lines because they *are* monopolies, but because such private ownership has proved itself to be the *source* of monopolies, because it contains an *inevitable tendency* toward monopoly."

This contention also appears to involve the assumption that the amendment prohibits these petitioners, and other companies of like character, from transporting their own oil by means of pipe lines, unless they also transport for others and become common carriers of that article. We have already endeavored to show that the legislation cannot be sustained even if this construction be accepted; but since such a construction seems to be suggested in support of the monopoly argument now considered, it may be suitable to add some observations to what has already been said. As heretofore stated, the amendment in terms applies to all persons and corporations engaged in the interstate transportation of oil by means of pipe lines, whether their business be extensive or insignificant, "who shall be considered and held to be common carriers within the meaning and purpose of this act." When this amendment was adopted in 1906 there were quite a large number of persons and corporations owning private pipe lines which they used in carrying on the business in which they were severally engaged, and the amendment operated upon all of them when it went into effect. They were thereby subjected to all the applicable provi-

sions of the act and declared to be common carriers within its meaning and purpose. The exclusive use of their pipe line properties, which they had theretofore enjoyed, was brought to an end, and those properties in effect appropriated for the use and benefit of others and required to be thereafter operated as public facilities in accordance with the provisions of the regulating statute.

The properties whose status was thus attempted to be changed had been acquired by the respective companies under the laws of the states of their creation, and without violation or evasion of any federal enactment. Each of these concerns was carrying on a legitimate business, whether producing oil in the crude state of a natural deposit, buying and selling it in that condition, or manufacturing an article better adapted to the needs of consumers by the process of refining; and the transfer of the crude oil by pipes from wells to tanks, from tanks to points where delivery was made to customers, or by refiners from points of production or purchase to their refineries, were in every sense legitimate business operations. Equipped with these valuable aids to their private pursuits, the pipe line owners all at once find themselves subject to a law which obliges them to become common carriers of oil under stringent regulations. It is idle to say that they can avoid the obligations which this amendment imposes by going out of the pipe line business. Practically speaking, they have no such election, because the discontinuance of pipe line transportation involves the virtual destruction and loss of their pipe line properties.

Nor is this alternative contemplated by the enactment. On the contrary, the only rational view of its intent and purpose assumes that these pipe lines would be kept in operation under the law which devoted them to public use. It is the "necessary or natural" effect of a statute which must be taken into account, as the Supreme Court said in Minnesota v. Barber, 136 U. S. 320, 10 Sup. Ct. 862, 34 L. Ed. 455; and it is beyond question that the persons and corporations brought within the reach of this amendment were not expected to abandon the pipe lines which they had constructed, but rather and beyond doubt to continue their use as public facilities under public regulation. The amendment was plainly designed to subject to public use these private pipe lines as they were then in operation and because in the nature of the case they must continue to be operated. The alternative of abandonment was not in contemplation, and there is no basis for the assumption here considered.

Can the amendment be sustained as a valid regulation to prevent monopoly or a tendency to monopoly? It is not open to doubt that Congress has power to legislate, within constitutional limits, for the prevention or suppression of monopoly; and the exercise of that power is manifested in the enactment of the potent and far-reaching anti-trust law of 1890. It is quite evident, however, and the government makes no claim to the contrary, that nothing which these petitioners are doing or have done amounts to a violation of the anti-trust law, for here there is no combination, no absorption or control of one by another, no concerted action of any sort, not even a common understanding. This being so, it must result that the amendment in

question, upon the theory now considered, is of broader scope and much more drastic character than the enactment of 1890, and that, as above stated, is the government's contention.

It will be observed that the amendment makes no mention of monopoly, and therefore does not purport on its face to be a measure for breaking up an alleged monopoly and preventing its continuance. But disregarding the absence of any declared purpose, and taking into account the circumstances under which the amendment was adopted, we may properly consider its validity upon the assumption that the real, though undisclosed, purpose was to destroy that degree of control of the oil business which is claimed to result from the private ownership of pipe lines and which is asserted to be monopolistic. The province of the courts in such an inquiry is defined in Minnesota v. Barber, supra, 136 U. S. 320, 10 Sup. Ct. 864, 34 L. Ed. 455, as follows:

"Upon the authority of those cases, and others that could be cited, it is our duty to inquire, in respect to the statute before us, not only whether there is a real or substantial relation between its avowed objects and the means devised for attaining those objects, but whether by its necessary or natural operation it impairs or destroys rights secured by the Constitution of the United States."

And in C., B. & Q. Ry. v. Drainage Com'rs, 200 U. S. 593, 26 Sup. Ct. 350, 50 L. Ed. 596, 4 Ann. Cas. 1175, it was said:

"If the means employed have no real, substantial relation to public objects which government may legally accomplish, if they are arbitrary and unreasonable beyond the necessities of the case, the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected by such illegal action. The authority of the courts to interfere in such cases is beyond all doubt."

We are therefore to determine whether there is any real and substantial relation between the assumed purpose of the amendment, which is the prevention of monopoly, and the means adopted to accomplish that result, namely, depriving petitioners of the exclusive use of their private pipe lines and requiring such lines to be operated for the benefit of the public, and whether the means so employed are arbitrary, unreasonable, and beyond the necessities of the case.

It is quite impossible for us to perceive any such relation, unless the operation of a private pipe line tends necessarily by its nature and the function it performs to produce a monopoly. The government asserts that this is the case and bases its argument upon that proposition; but neither in brief nor oral argument is there any statement of the ground or reasons upon which the assertion is predicated. Explanation is wanting of how it happens, or why it follows, or from what facts it is deduced, that the private operation of a pipe line in the private business of its owner produces, or has any tendency to produce, the conditions and results which the law denounces as a monopoly. Much is said about the debates in the Senate when the amendment was pending, and reference is made to the report of the Commissioner of Corporations submitted shortly before, which gives a full account of the investigation that Congress had previously or-

dered. But we find nothing either in the debates or the report which has any appreciable bearing upon the question now considered. The discussions in the Senate and in the report of the Commissioner deal with the conditions of unified ownership or control by the Standard Oil Company of a great portion of the pipe lines of the country, including the common carrier pipe lines, and the resulting advantage and power of that company, which were alleged to constitute an unlawful monopoly. But this comes quite short of disclosing how or why a private pipe line used solely in its owner's private business becomes of necessity, or can become while so employed, a facility which he may be forbidden to use, or the use of which he may be compelled to give to the public, because it is claimed to be a monopoly or to have a monopolistic tendency.

We are therefore unable to see that the Standard Oil Case has any application to the present controversy. That case involved the monopolization or tendency to monopoly which was alleged to result from the combined control by the Standard Oil Company of New Jersey, through its dominant ownership of the stocks of numerous companies, of the greater part of all the pipe lines of importance throughout the country, both public and private, together with numerous refineries and facilities for marketing which were potentially competitive. Standard Oil Company v. United States, 221 U. S. 70–77, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. The Supreme Court held that this vast combination and the methods of dealing which its power enabled it to enforce constituted a monopoly forbidden by law. But that is far from saying that private pipe lines separately owned by dealers in oil or refiners, and used by them in the private business in which each is separately engaged, are or can be a monopolistic possession. In short, there is no process of reasoning which sustains the contention that the ownership and operation of private pipe lines, such as are here involved, tends in the nature of things to or results in monopoly.

We have searched the decisions in vain for any definition of monopoly, any statement of its elements, or description of its characteristics, which would include or apply to the activities of these petitioners and similar pipe line owners. In the absence of some contract or combination between competitors, some mutual agreement or understanding which has in view or actually results in restricting competitive freedom, all of which are here wanting, it would seem that monopoly by a single individual must consist of or be effected by some acts or series of acts or continued course of dealing which operates to deprive others of privileges or opportunities which rightfully belong to them and which they would otherwise enjoy. But how does the possession of a private pipe line by one of many oil producers or dealers take from the others any privilege or opportunity which is rightfully theirs or which they are justly entitled to share with the more fortunate owner? Of what right can they be said to be deprived, or in what respect are they subjected to any injury or disability which is illegal?

True, the possession of a pipe line enables its owner to transport his oil to the refinery or other market at very small cost compared with any other means of conveyance. The practical result may be, and in most instances doubtless would be, that other producers find it to their interest to sell the output of their wells to the owner of the pipe line, and in this sense it may be said that they are obliged to sell to him. Granted that his pipe line gives him such command that he is able to control or even fix the selling price of the crude article in that particular field or territory, upon what sustainable theory can it be claimed that other producers are deprived of anything which rightfully belongs to them because they do not or cannot provide themselves with the same means of reaching the market? And upon what conception of constitutional rights can it be contended that Congress has the power to transform this private pipe line into a public facility and require its owner to become a common carrier? If this can be done, if a mere act of legislation can change the legal status of his property from private to public and compel him against his will to devote that property to public use, with all the burdens and obligations which he must thereby assume, is not the fifth amendment as to him shorn of its vitality and its protective power reduced to a shadow?

In the nature of things one who owns private property of substantial value has an advantage over those not fortunate enough to have similar possessions, and this advantage ranges through all degrees. It frequently results in commercial dominance of precisely the same sort and quite as complete as the alleged monopoly here considered. But the advantage so acquired, whatever its degree, is not monopolistic, nor are we able to see that it has any tendency, much less an inevitable tendency, to bring about the conditions which constitute an unlawful monopoly, except upon the socialistic theory that all private ownership is indefensible and that everything should be held in common. The simplest conception of private property implies possession which is exclusive and enjoyment from which others may be debarred; it cannot otherwise be *private*. The advantage which comes from its legitimate use is a necessary incident of private ownership, and it is a misuse of terms to say that this advantage tends to monopoly. Although the private use of private property excludes others from the benefits and opportunities which the owner enjoys, and which might accrue to others if they shared in that use, yet this is not monopolization, whatever its indirect consequences, because those who are excluded have no rightful claim to that which belongs to the owner himself. It is only repeating to say that the private use by petitioners of the pipe lines in question has no relation to monopoly, and in no correct sense of the word tends to monopoly, since such use does not exclude others from any privilege which is rightfully theirs and involves only that exclusion which is inseparable from the possession and enjoyment of private property. It may be that the greater number of oil producers are virtually compelled to sell their output to the owners of private pipe lines, because they are unable or unwilling to build pipe lines of their own, or because there are no common carrier pipe lines to which they have access; but we are quite unable to see

how the situation in which such producers are placed gives them the right, or what constitutional power Congress can exert to endow them with the right, to use the private lines of petitioners and other private companies, or how the denial of such use is a monopolistic exclusion, or indicates a tendency to monopoly, which deprives these private owners of the protection guaranteed by the fifth amendment. In our judgment there is no basis for the contention that the pipe line amendment has any real or substantial relation to the monopoly alleged to result from the nature and methods of pipe line transportation.

This conclusion in effect disposes of the kindred contention that any injury to private pipe line owners resulting from the amendment is not a taking of their property but is merely incidental to the legitimate exertion of governmental power. The paragraph already quoted from Minnesota v. Barber, 136 U. S. 320, 10 Sup. Ct. 864, 34 L. Ed. 455, declares it to be the duty of the court, in considering legislation of this character, to inquire "whether by its necessary or natural operation it impairs or destroys rights secured by the Constitution of the United States."

Keeping in mind the unmistakable intent and meaning of this amendment, it seems to us quite obvious that its "necessary or natural operation" must impair and measurably destroy rights of ownership and use which the Constitution protects from invasion, and accomplish inevitably a taking of property within the meaning and intent of the fifth amendment. As already pointed out, the amendment does not in terms or contemplation prohibit the continued use of these private pipe lines by their respective owners, nor does it attempt to regulate in any way their use and operation *as private lines*. It does neither of these things. It goes much further, and aims at something essentially different, since it undertakes to deprive the owners of private pipe lines of the exclusive use of their property, devotes that property to the service of the public, and compels them to become common carriers against their will. Does not this of necessity amount to a taking of private property for public use, and how can it be reasonably claimed that the resulting injury is only incidental? We have examined all the cases cited by counsel and many others which deal with the police powers of the states and the exercise of analogous powers by Congress, but none of them reaches the question here presented or gives support to the government's contention. It seems to us too plain for argument that these private pipe lines cannot be legislated into public facilities, and that the amendment necessarily deprives the owners of such lines of their property rights without just compensation.

"The constitutional requirement of due process of law, which embraces compensation for private property taken for public use, applies in every case of the exertion of governmental power. If in the execution of any power, no matter what it is, the government, federal or state, finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner." C., B. & Q. Ry. v. Drainage Commissioners, supra, 200 U. S. 593, 26 Sup. Ct. 350, 50 L. Ed. 596, 4 Ann. Cas. 1175.

So much was said in argument about the Commodities Case that we refer to it briefly for the purpose of pointing out the fundamental difference, as we conceive, between the question there decided and the question involved in the cases at bar. In that case the Supreme Court was dealing with a law prohibiting railroad companies, which are common carriers in a complete and peculiar sense, from transporting their own property, with certain exceptions. It is unquestionably a valid regulation of interstate commerce to require the public carriers of that commerce to charge like rates for like service and to make no unjust discrimination between persons or places. To give full effect to such a fundamental principle of regulation, Congress has ample power to prevent anything which impairs its full operation. It may therefore prohibit any use of an interstate railroad which is inconsistent with or antagonistic to the equal public use which such a railroad is bound to afford, or which is liable to defeat in any respect or degree the public purpose for which it is chartered. But it is an altogether different proposition to say that Congress, under the guise of regulating interstate commerce, may by a legislative decree convert these private pipe lines into public utilities and force their unwilling owners to take upon themselves the obligations of common carriers. We find nothing in the Commodities Case which is at all at variance with the views herein expressed or which tends to support the validity of this amendment.

It is hardly necessary to observe that the legislation under review involves no question of public morals, or health, or safety, and therefore it seems plain that the doctrine of the Lottery Case and similar decisions has no application to the present controversy.

[4] It remains to consider briefly some minor contentions, which appear to be more or less relied upon by the government, and which perhaps should not be left unnoticed. One of these contentions is based upon facts which are common to all private pipe line companies; the others arise out of facts which are peculiar to one or more of these petitioners.

1. The pipe lines of each company are in numerous instances laid across, and sometimes along, public streets and highways, usually below the surface, under permission of the local authorities. From this circumstance or condition it is suggested that the petitioners bring their pipe lines within the regulating power of Congress, as they might not if there were no use or occupancy of lands dedicated to the public for highway purposes. Upon this point we concur in the opinion expressed by the Commission in its report, as follows:

"* * * It appears that the usual policy of the lines is to deal with the owner of the abutting property in acquiring such highway rights upon the theory that such abutting owners own also the fee in the highway, and that the public right therein is a mere easement of passage. That this is the general rule of law there can be no doubt, and the few exceptions occur in states where the question here at issue is unlikely to arise. We are of the opinion that a pipe line is not impressed with the obligations of a common carrier merely because, by arrangement with the abutting owner, it uses a public highway for right of way purposes."

Accepting this as a correct statement of the law, it follows that Congress has no power to compel a private pipe line owner to become a common carrier of oil merely because his pipe line crosses or is laid along public highways.

2. We also agree with the Commission that the validity of this amendment is not sustained by the fact that the pipe lines of some of the petitioners, for shorter or longer distances, are laid upon the rights of way of certain interstate railroads under contract arrangements between the pipe line owners and such railroads. Whatever may be the right of a railway company to permit such use of its property or the authority of Congress to prohibit it, we are clearly of opinion that the power to compel these petitioners to become common carriers of oil, if that power be otherwise wanting, is not brought into existence as to them by the circumstance that portions of their lines are constructed and operated on railroad rights of way. Whether or not a given pipe line company is a common carrier depends upon the business in which it engages and for which its pipe lines were provided, and not upon the character of the route upon which those lines are located.

[5] 3. As above stated, the Prairie Oil & Gas Company was organized in 1900 under the laws of the state of Kansas. Subsequently, in 1905, the Legislature of that state passed a law containing this provision:

"All pipe lines laid, built, or maintained for the conveyance of crude oil within the state of Kansas are hereby declared to be common carriers, and said conveyance of said oil shall be in the manner and under the restrictions in this act provided." Laws 1905, c. 315.

We are of the opinion, without reviewing the argument, that this law was passed in disregard of the Constitution of the state of Kansas and is therefore invalid; and it appears not to have been enforced in that state. Moreover, it seems sufficient to say, as the Commission in substance says, that federal power in such a case is not derived from a state enactment, and that, if Congress is without power to compel private pipe line companies to become common carriers of oil in interstate commerce, a state statute is not less ineffectual. In this connection it is rather interesting to observe that the Uncle Sam Oil Company claims to be prohibited by the laws of the state of its creation from engaging in the business or acting in the capacity of a common carrier.

4. It appears that portions of the lines of the Prairie Oil & Gas Company and of the Uncle Sam Oil Company were laid through Indian lands under a permit granted by the Secretary of the Interior. Among the rules and regulations for granting rights of way to pipe line companies prescribed by the Secretary of the Interior on December 2, 1906, was the following:

"And no application for the construction of a pipe line will be approved unless the applicant agrees that such pipe line shall be held to be a common carrier and agrees to all the provisions hereof."

We are satisfied from the record that the permit to the Prairie Oil & Gas Company was granted prior to the date mentioned and under regulations which did not contain the quoted condition. This being

so, there is no basis for contending that this company assumed any public obligation by reason of the fact that it was permitted to lay its lines across the lands in question. Moreover, we incline to the opinion, from examination of the law under which the Secretary acted, that he had no authority to impose such a condition (United States v. McMurray [C. C.] 181 Fed. 723); and this, perhaps, accounts for the circumstance that the condition was eliminated in 1909, as we understand the matter, and has not since been required. It is also to be noted with reference to this contention that no part of the lines of these companies, including those laid across Indian lands, has ever been used as a common carrier line or for any other purpose than to transport the property of its owner.

[6] 5. The remaining contention relates to the pipe lines of the Standard Oil Company of New Jersey, and is based upon facts which, so far as deemed material, may be summarized as follows: The line from Unionville across the state of New Jersey to the Bayonne refinery was built upon private rights of way and put into operation in 1882 by the National Transit Company, which, under the terms of its charter, is a common carrier in the state of Pennsylvania. About May 1, 1894, this line was transferred to the New York Transit Company, which was incorporated under a law of the state of New York, by virtue of which it became a common carrier within that state. The line from Centerbridge to the Bayway and Bayonne refineries was built upon private rights of way and put into operation in 1897 by the National Transit Company. The line from Fawn Grove to the Baltimore refinery was likewise built upon private rights of way and put into operation about 1885 by the National Transit Company.

The New York Transit Company was never reincorporated in the state of New Jersey, nor was the National Transit Company ever reincorporated in the state of New Jersey or the state of Maryland. In neither of these states is there any law providing for the organization of common carrier pipe line companies, and neither of the corporations mentioned has ever possessed or attempted to exercise the right of eminent domain in New Jersey or Maryland. Nor has either of them, under the laws of those states, or by virtue of any agreement connected with its acquisition of rights of way or otherwise, ever assumed the obligations of a common carrier, or at any time acted in that capacity, in the states in which the lines in question are located.

Subsequently these three lines were sold and transferred to the Standard Oil Company of New Jersey, one of the petitioners herein. The preliminary steps appear to have been taken in November, 1905, and the sale consummated by delivery of deeds of conveyance in July, 1906. Shortly afterwards the purchaser took over the entire operation of the lines, and has since used them exclusively for transporting its own oil to the refineries mentioned; and we assume for present purposes that this transfer was made in anticipation of the passage of this amendment or some similar law, and to avoid any undesired consequences which might follow from such legislation if the lines remained in the possession of their former owners.

Nevertheless we are unable to see that the facts here referred to

place the owner of these particular lines on any different footing from other private pipe line companies as respects the validity of the pipe line amendment. The former owners were never under obligation by their charters or otherwise to perform the duties of a common carrier in New Jersey or Maryland. They never had held themselves out as common carriers in those states; nor had either of them in fact carried oil therein, except for a single customer. The fact that the transit companies were organized as common carriers in New York and Pennsylvania did not make them common carriers in New Jersey or Maryland; nor, in our opinion, would it prevent them, even if they had been carrying for the public, from discontinuing such service in the latter states and becoming therein purely private pipe line companies. Weems Steamboat Co. v. People's Co., supra. We think it also clear that they had the right to sell these New Jersey and Maryland lines to the Standard Oil Company, that the purchaser had a right to acquire and use them exclusively in its private business, and that no public obligation was thereby assumed or public duty imposed (Oman v. Bedford-Bowling Green Stone Co., 134 Fed. 64, 67 C. C. A. 190); and it is equally clear that neither the right of the transit companies to sell nor the right of petitioner to buy was affected by the assumed motive for the transaction. Without amplifying the argument we have no hesitation in holding that, if the amendment in question is invalid as to the other private pipe line companies, for the reasons above stated, it is equally invalid as to this petitioner and the particular lines here considered.

This discussion might be prolonged almost indefinitely, for the underlying question is full of suggestions; but enough has been said to indicate the general reasons upon which we base our conclusion. We are impressed with the serious and unwelcome responsibility of invalidating in any respect an act of Congress, because it manifests an exertion of power in excess of constitutional limitations. But we cannot escape the conviction that this pipe line amendment, which we must construe according to its undoubted meaning, is an act of legislation which plainly invades the rights secured to these petitioners by the fifth amendment, and we cannot, therefore, do otherwise than stay the enforcement against them of the Commission's order. Without reference to other considerations which might justify preliminary injunctions in these cases, we have purposely placed our decision upon grounds which in effect determine the controversy, and we have done so to avoid occasion for protracted trials and to aid an early review by the court of last resort.

A preliminary injunction will be granted as prayed for in each of the above-entitled cases, and it is so ordered.

MACK, Judge (dissenting). I concur with the majority of the court in their construction of the statute. Because of the conclusions reached on the constitutional question, it is unnecessary for me to differentiate the several petitioners or to express any opinion on the so-called minor contentions.

On the fundamental question of the constitutionality of this legislation, under which, in effect, interstate transportation of oil by pipe lines is prohibited unless the transporter will act as a common carrier subject to the provisions of the interstate commerce act, I am compelled to dissent. It is conceded in the majority opinion that an act of Congress is constitutional if its object is within the realm of federal authority, and if the means employed for its accomplishment have a real and substantial relation thereto, and are not arbitrary, unreasonable, and beyond the necessities of the case.

A doubt, however, is not to be resolved against but in favor of the validity of legislation. Courts should not declare a statute unconstitutional until they are satisfied thereof beyond a reasonable doubt. Whether consistently carried out in practice or not, this has ever been a fundamental rule in our jurisprudence. Ogden v. Saunders, 12 Wheat. 213, 6 L. Ed. 606. While its application alone would compel me to dissent in this case, I do not rest my conclusions upon the existence of a reasonable doubt. In my judgment, the act is within the power of Congress to regulate interstate commerce.

This power may be exerted for many purposes: directly, to remove restraints thereon or obstructions thereto; indirectly, to conserve the public health or morals or to promote the general welfare. The means to be adopted for the accomplishment of a legitimate purpose rest in the sound discretion of Congress subject only to the limitation hereinbefore stated. As the Supreme Court in its most recent decision bearing on this question says (Hoke v. U. S., 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. ——, Feb. 24, 1913):

"Congress may adopt not only means necessary but convenient to its exercise and the means may have the quality of police regulations."

What, then, is the object of this act? Its aim is neither completely to take from the owner or absolutely to prohibit his use of pipe lines theretofore within his exclusive control; it does, however, condition that use in interstate commerce upon his permitting a like use by the general public on payment of reasonable compensation therefor; the alternative is to cease to operate them or to dispose of them.

Clearly, therefore, the general purpose is to regulate interstate commerce in oil; the immediate specific object is to remove a serious obstruction to the free play of competitive forces in the industry, to prevent a monopolization of a part of such commerce. It is immaterial that this purpose is not proclaimed in the act itself; the history of the legislation and the debates, particularly in the Senate, leave no room for doubt as to the evils which Congress and the public generally believed to exist.

In 1905 the House of Representatives had directed an investigation of the oil industry by the Bureau of Corporations. In 1906 a first report (59th Cong., 1st Sess., H. R. Doc. 812) was made, primarily on the operations of the Standard Oil Company. (This was followed in 1907 by two more elaborate reports, as well as by a report of the Interstate Commerce Commission, 59th Cong., 2d Sess., H. R. Doc. 606.) The relation of pipe lines and pipe line transportation to

the development of the industry was fully detailed; it was therein demonstrated, not merely that the unification of many of these lines under the Standard Oil Company was the keystone of its practical monopoly in the refined products, but also that the possession of the only pipe line in any field necessarily gave the owner thereof control in the distribution of oil there produced. He was for all practical purposes the sole available customer for the greater part of crude oil and could thus ordinarily fix the price to be paid therefor. This was due to the utter practical impossibility of competition between one dependent upon railroad transportation and one who could transport his crude product through pipe lines. The important customer of the crude oil producer is the refiner. But as refineries are generally and more advantageously located in the great markets and near the seaports, and not in the oil fields, most of the crude oil must be transported. Physically, this could be done in barrels or tank cars by railroad; economically, railroads cannot compete with pipe lines, because the actual cost of railroad transportation is three or four times that of pipe line transportation.

A pipe line, however, is not a transportation facility readily available to the producer, as is a horse and wagon, or to-day even an automobile, to the average farmer. In the developed stage of the oil industry it is, in its very nature, analogous to the instrumentalities used by common carriers and other public-service corporations. Ordinarily these lines are hundreds of miles in length. Like railroads, there are trunk and branch lines; to construct them requires large capital; to duplicate them between an oil field and its natural market would usually involve economic waste similar to that caused by paralleling railroad lines.

An individual or corporation controlling the pipe line transportation in any field would thus have the same opportunity of monopolizing the distribution of the crude oil from that field as the owner of the only railroad in any section would have to monopolize the distribution of most articles produced or manufactured along the line. His ownership gives him the practical power of monopolizing the purchase of the goods and of fixing the price thereof, and thereby of monopolizing interstate commerce therein, at least, in certain territories. In the one case, as in the other, governmental regulation is essential to check this evil.

The actual situation in 1906, as reported to Congress, was that most pipe lines, both common carrier and private, were under the domination of the Standard Oil Company. The Commissioner of Corporations had said that it had "all but a monopoly of the pipe lines in the United States," and that "its control of them was one of the chief sources of its power." 59th Cong., 1st Sess., H. R. Doc. 812, pp. 36 and 37.

In Purity Extract & Tonic Co. v. Lynch, 226 U. S. 192, 33 Sup. Ct. 44, 57 L. Ed. ——, the Supreme Court says:

"The existence of power is not to be denied simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat."

And so it may well be that, even if the primary purpose of the act were to prevent the use of the pipe lines as an essential element in and for the purpose of building up the Standard Oil Company's monopoly in the refined products, the power of Congress is not to be denied merely because some other lines are brought within the terms of the act.

To determine, then, whether the means adopted to secure these legitimate ends are reasonable or not, we must consider what remedies were available by which the channels and instrumentalities of interstate commerce could be kept open so that all producers on payment of a reasonable compensation might be enabled to compete freely in their natural markets.

Government ownership either through condemnation by eminent domain or through the construction of new lines would be possible; but at this time, and until every other available measure of relief shall have proved ineffective, such a radical departure from the previous policy of regulation, entailing, in the judgment of many, evils far greater than those attempted to be cured, cannot be deemed so feasible an alternative as to necessitate its adoption. Subjection of *common carrier* pipe lines to the stricter supervision and regulation prescribed by the interstate commerce act would afford only partial relief; many, if not most, of the important lines were not operated by common carriers.

Disintegration of the Standard Oil Company under the Sherman Act would probably result in freer competition, but it would not give the necessary relief to independent producers, who would still have to sell to the private pipe line owner or stimulate effectively the construction of independent refineries, which, under a régime of private pipe lines, would have difficulty in securing the crude product.

The only feasible remedy was the one adopted by Congress, to make the existing facilities available to the public generally, by prohibiting their use except on this condition. That thereby the exclusiveness of private ownership was invaded does not render the act unconstitutional. The case of Weems Steamboat Co. v. Peoples Co., 214 U. S. 345, 29 Sup. Ct. 661, 53 L. Ed. 1024, 16 Ann. Cas. 1222, held only that at *common law and without statutory grant* no one could compel another to permit the use of his property for just and reasonable compensation merely because the property, a private wharf, was a desirable or even an essential facility of commerce. The court, however, expressed no opinion on the validity of legislation compelling such permission.

Congress, like the state Legislatures, can authorize the actual destruction of private property if such destruction be reasonably essential to the accomplishment of a legitimate legislative purpose. Hipolite Egg Co. v. U. S., 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. 364. It may prohibit and it has absolutely prohibited certain forms of interstate commerce. Hoke et al. v. U. S., supra; The Lottery Case, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492.

Under the Sherman Act, disintegration of vast combinations of capital has been decreed, irrespective of the depreciation therein produced in the value of property. Standard Oil Co. v. U. S., 221 U. S.

1, 31 Sup. Ct. 502, 56 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. Under the commodities clause common carriers are prohibited from transporting certain of their own property, and are thus compelled to part with the ownership before transportation, regardless of the loss suffered thereby. U. S. v. D. & H. Co., 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836. By the Carmack amendment the burden of responding in damages to a shipper for losses occasioned by the acts of independent, but connecting, carriers is imposed upon the initial carrier "as a condition of continuing in that traffic." A. C. L. v. Riverside Mills, 219 U. S. 186, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7.

And in cases not involving common carriers, prohibition acts adopted under a state power no more extensive than that granted to Congress by the commerce clause as limited by the fifth amendment have been held constitutional, despite the practical destruction thereby of most of the value of brewery and distilling plants. Mugler v. Kansas, 123 U. S. 625, 8 Sup. Ct. 273, 31 L. Ed. 205. And if a state, in the regulation of private business, such as banking, in order to promote the public welfare, may "go from regulation to prohibition except upon such conditions as it may prescribe" (Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. [N. S.] 1062, Ann. Cas. 1912A, 487; see Engel v. O'Malley, 219 U. S. 128, 31 Sup. Ct. 190, 55 L. Ed. 128), is the federal government to be denied the use of like means?

The power to regulate cannot, of course, be used, either directly or by the imposition of conditions precedent to the exercise of the right to engage in interstate commerce, as a subterfuge to extend the jurisdiction of the federal government to those matters over which the states have exclusive control. Employers' Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297. The amendment in question, however, makes no such attempt. The condition thereby imposed is not in any sense a regulation of domestic commerce; it is directly and essentially a regulation of interstate commerce alone.

The remedy prescribed by this amendment is far less drastic than that adopted to abate other restraints on interstate commerce; that it is feasible is demonstrated by the fact that many pipe lines are operated by common carriers, and that in at least two states, Kansas and West Virginia, all pipe line carriers are declared by statute to be common carriers. Therefore, in my judgment, it cannot be deemed an unreasonable or arbitrary exercise of legislative power.

But if, as is contended, the act cannot be sustained as a legitimate regulation of commerce, if it amounts to a taking of private property for public use, does it afford the owner the just compensation to which he is constitutionally entitled? To deprive one of the entire or partial use of property is a taking thereof. A distinction, however, may well be made in the method of compensation, dependent upon whether the owner is deprived of his title, of the possession, or only of the exclusive use. Otis Co. v. Ludlow Co., 201 U. S. 140, 26 Sup. Ct. 353, 50 L. Ed. 696, and Clark v. Nash, 198 U. S. 361, 25 Sup. Ct. 676, 49 L. Ed. 1085, 4 Ann. Cas. 1171, are cases in which only the exclusive-

ness of the owner's use of his property was invaded; his title and possession were undisturbed. In the former, only a right of action in tort was given to the upper riparian landowner for the damages that would be caused from time to time by overflowing his land pursuant to a statutory right granted to the builder of a dam; in the latter, while payment for the easement of bringing water through a neighbor's private irrigation ditch was required under a statute granting individual owners of arid land the right so to use the private property of others, no security was provided for the share of maintenance expense to be paid from time to time. Each of the statutes was held to be constitutional.

In the present case, just and reasonable compensation for the use to be made from time to time of these pipe lines is secured, and it may well be doubted whether any other or additional compensation can constitutionally be demanded merely because of the change in the status of the pipe line owner to that of a common carrier and the consequent subjection of the line itself and of the owner to the regulatory supervision of the Interstate Commerce Commission.