# UNITED STATES ET AL. *v.* CHAMPLIN REFINING CO.

No. 433.   Argued March 8–9, 1951.—Decided May 7, 1951.

*Charles H. Weston* argued the cause for appellants. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, John F. Davis, Daniel W. Knowlton* and *H. L. Underwood.*

*Dan Moody* argued the cause for appellee. With him on the brief were *Harry O. Glasser, Nathan Scarritt, E. S. Champlin* and *Samuel H. Horne.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Section 1 of the Interstate Commerce Act provides that "common carriers" engaged in the "transportation" of oil or other commodities shall be subject to the regulatory requirements specified in other sections of the statute.[1] In an earlier proceeding, this Court found that Champlin, as owner of a pipe line, was a "common carrier" within the meaning of § 1; and on the record there presented the Court upheld an I. C. C. order under § 19a (a)–(e) of the Act requiring the company to submit valuation data, maps, charts and other documents pertaining to its operations.[2] *Champlin Refining Co.* v. *United States,* 329 U. S.

---

[1] 49 U. S. C. § 1:

"(1) *Carriers subject to regulation.*

"The provisions of this chapter shall apply to common carriers engaged in—

.  .  .  .  .

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line . . . .

.  .  .  .  .

"(3) . . . (a) The term 'common carrier' as used in this chapter shall include all pipe-line companies; . . . ."

[2] 49 U. S. C. § 19a:

"(a) *Physical valuation of property of carriers; classification and inventory.*

"The Commission shall . . . investigate, ascertain, and report the

29 (1946). The present proceeding involves a subsequent I. C. C. order directing Champlin (1) to file annual, periodic and special reports, and to institute and maintain a uniform system of accounts applicable to pipe lines, both under § 20 of the Act; [3] and (2) to publish and file schedules showing the rates and charges for interstate transportation of refined petroleum products, pursuant to § 6.[4]

---

value of all the property owned or used by every common carrier subject to the provisions of this chapter . . . .

"(e) . . . Every common carrier subject to the provisions of this chapter shall furnish to the commission or its agents from time to time and as the commission may require maps, profiles, contracts, reports of engineers, and any other documents . . . ."

[3] 49 U. S. C. § 20:

"(1) *Reports from carriers and lessors.*

"The Commission is authorized to require annual, periodical, or special reports from carriers . . . .

"(3) *Uniform system of accounts.*

"The Commission may, in its discretion, for the purpose of enabling it the better to carry out the purposes of this chapter, prescribe a uniform system of accounts applicable to any class of carriers subject thereto . . . .

"(4) *Depreciation charges.*

"The Commission shall . . . prescribe for carriers the classes of property for which depreciation charges may properly be included under operating expenses, and the rate or rates of depreciation which shall be charged . . . .

"(8) . . . the term 'carrier' means a common carrier subject to this chapter . . . ."

[4] 49 U. S. C. § 6:

"(1) *Schedule of rates, fares, and charges; filing and posting.*

"Every common carrier subject to the provisions of this chapter shall file with the commission . . . and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation . . . ."

Section 1 (5) of the Act provides that all charges "shall be just and reasonable." 49 U. S. C. § 1 (5).

A specially constituted three-judge District Court, with one member dissenting, refused to enforce the order on the ground that Champlin, at least for the purposes of §§ 6 and 20, is not within the class of carriers intended to be regulated by the Act. It held further that to impose the requirements of § 6 on Champlin would be to take its property without due process in violation of the Fifth Amendment. 95 F. Supp. 170. The Government and the Commission appealed, 28 U. S. C. §§ 1253, 2101 (e), 2325.

The facts here are substantially the same as in the earlier case. Champlin owns and operates a pipe line running from its refinery at Enid, Oklahoma, to terminals at Hutchinson, Kansas; Superior, Nebraska; and Rock Rapids, Iowa—a distance of 516 miles. It uses the pipe line solely to carry its own refined petroleum products, such as gasoline and kerosene. No other refiner has connections with the line, and none has ever shipped products through it. The line does not connect with any other pipe line. Champlin has storage facilities at each of its three terminals. Jobbers purchasing Champlin products supply their own transportation from the storage tanks to their bulk depots.

Since the first case, there has been a change in Champlin's method of quoting prices. At the time of the earlier proceeding, the price was computed as f. o. b. the Enid refinery, plus a differential equal to the through rail rate from Enid to the purchaser's destination minus the charges for local transportation between the nearest pipe-line terminal and the destination. However, Champlin made frequent and substantial departures from this formula in order to meet competitive prices at various locations. In May 1948, the company began quoting prices as f. o. b. the respective terminals, a policy which is still in effect. But as before, adjustments are made so that

delivered prices to jobbers will be competitive with those offered by other refiners.

On the basis of these and other facts, the Government contends (1) that there are no significant factual differences between this and the prior case, and therefore Champlin is barred by collateral estoppel from relitigating the holding of this Court that it is a "common carrier" engaged in "transportation" within the meaning of § 1 of the Act; (2) that since the definition of "common carrier" in § 1 applies to §§ 6 and 20 as well as to § 19a, the Court's prior holding *per se* establishes the validity of the present order; (3) that even if estoppel does not apply, the facts are adequate under the statute to support the Commission's order; (4) that the alleged constitutional question is frivolous.

Champlin claims (1) that factual changes remove this case from the realm of collateral estoppel; (2) that the Court specifically reserved the statutory issue presented by this case, namely whether the I. C. C. may convert a private carrier into a common carrier for hire; and (3) that the lower court was correct in holding that the Act violates the Fifth Amendment if construed to authorize the I. C. C.'s order.

We agree with the Government that there have been no significant factual changes in Champlin's operations since the prior case. The practice of quoting prices f. o. b. Enid made it superficially more obvious that transportation charges were being collected, a point which the Court brought out. 329 U. S. at 34. And the record indicates that the change to an f. o. b. terminal formula resulted in minor alterations in the pattern of relative delivered prices at various locations. But Champlin is still transporting, and unless it has launched on a calculated plan of bankruptcy, its prices on the average are necessarily intended to cover transportation costs as well as other costs. Champlin further points out that it has con-

structed ethyl plants at two of its pipe-line terminals and is there processing some 20 percent of its products. It claims that this change makes the pipe line a part of "manufacturing" facilities and thus brings the company within the *Uncle Sam* rule, which excepted a class of gathering lines from the coverage of the Act. *Pipe Line Cases,* 234 U. S. 548, 562 (1914). But a Champlin officer testified in this case that the company has "always done some blending and treating" of its products at the terminals; and 80 percent of the products are still transported in their final form. Hence, there is no justification for reconsidering this Court's refusal to "expand the actual holding" of the *Uncle Sam* case to include Champlin, and its ruling that Champlin was a "common carrier" as defined by § 1 of the Act.

However, we disagree with the Government's contention that the prior holding disposes of all the statutory issues in this case. To be sure, the literal terms of the statute lend some weight to the Government's argument. Section 1 (1) provides that "the provisions of this part" shall apply to "common carriers" as defined, the word "part" referring to §§ 1–27 inclusive. Section 19a, under which the earlier order was issued, applies to "every common carrier subject to the provisions of this part." Section 20 applies to "carriers," which is defined in subparagraph (8) as "common carrier[s] subject to this chapter"; and § 6 applies to "every common carrier subject to the provisions of this chapter." Hence, the Commission's jurisdiction to issue orders under any of these sections is determined by a decision that a company is a "common carrier" under § 1. The Government in effect argues, however, that a decision as to jurisdiction also settles the merits, that facts adequate to support a specific valuation order under § 19a are also adequate to support an order under §§ 6 and 20. But this is the very conclusion which this Court necessarily rejected in *Champlin I.* In

that case, it was Champlin which argued that an interpretation encompassing it within § 1 would convert a private pipe line into a public utility and require it to become a common carrier in fact. But the Court stated that "our conclusion rests on no such basis and affords no such implication. . . . The contention . . . is too premature and hypothetical to warrant consideration . . . ." 329 U. S. at 35. In holding merely that Champlin could be required to submit information as a "common carrier" under the Act, the Court plainly indicated that the application of more rigorous sanctions would be reserved for treatment as an independent statutory issue on a proper record.

The reasons for this approach were suggested in *Valvoline Oil Co.* v. *United States,* 308 U. S. 141, 146 (1939). Collection of information has a significance independent from the imposition of regulations, whether or not such regulations ever come forth. Valuation and cost data from companies not subject to rate making may add to the statistical reliability of standards imposed on those companies which are. "Publicity alone may give effective remedy to abuses, if any there be." *Id.* at 146. Disclosure may alter the future course of a company otherwise disposed to indulge in activities which the statute condemns. Disclosure provides the basis for prompt action should a future change in circumstances make full-scale regulation appropriate. Finally, reports may bring to light new abuses and thus provide the groundwork for future statutory amendments. We assume that the Congress which passed the Interstate Commerce Act was well aware of these benefits. We conclude, as before, that the Congress did not mean to eschew them by omitting a general provision empowering the Commission to collect pertinent data from all interstate pipe lines.

The prior holding, therefore, supports that part of the Commission's order involving § 20 of the Act. The re-

quirement of annual and special reports cannot be differentiated from a request for maps, charts and valuation data. The requirement that Champlin maintain a uniform system of accounts is somewhat more burdensome, but we think its independent value as a measuring rod for companies fully regulated under the Act is clearly sufficient to justify the Commission's requesting so much as is pertinent.

At the same time, we find it hard to conclude, despite the generality of the statutory terms used, that Congress intended to apply the sanctions of § 6—imposing the duty of serving the public at regulated rates—on all private pipe lines merely because they cross state lines. The statute cannot be divorced from the circumstances existing at the time it was passed, and from the evil which Congress sought to correct and prevent. The circumstances and the evil are well-known. Pipe lines were few in number and heavily concentrated under the control of one company, Standard Oil. That company, through the ownership of subsidiaries and affiliates, had "made itself master of the only practicable oil transportation between the oil fields east of California and the Atlantic Ocean and carried much the greater part of the oil between those points. . . . Availing itself of its monopoly of the means of transportation [it] refused through its subordinates to carry any oil unless the same was sold to it or to them . . . on terms more or less dictated by itself." *Pipe Line Cases, supra,* at 559. Small independent producers—who lacked the resources to construct their own lines, or whose output was so small that a pipe line built to carry that output alone would be economically unfeasible—were in a desperate competitive position. There is little doubt, from the legislative history, that the Act was passed to eliminate the competitive advantage which existing or future integrated companies might possess from exclusive ownership of a pipe line.

This evil could not have been reached by bringing within the coverage of the Act only those pipe lines who were common carriers for hire in the common-law sense. Attempts so to limit the Act's scope were made during the course of congressional debates. Senator Lodge, sponsor of the principal amendment, rendered the obvious answer that such an alteration would "absolutely destroy [the proposal] . . . so far as its effectiveness is concerned." 40 Cong. Rec. 7000 (1906). Hence the bill as finally enacted was clearly intended "to bring within its scope pipe lines that although not technically common carriers yet were carrying all oil offered, if only the offerers would sell at their price." *Pipe Line Cases, supra,* at 560. And see *Valvoline Oil Co.* v. *United States, supra.* We may also assume for purposes of argument—no such facts ever having been before this Court—that the generality of the term "all pipe lines" was meant to impose full regulation on integrated producer pipe lines who exploit a competitive advantage simply by refusing to deal with independent producers having no comparably cheap method of reaching consuming markets. But it would be strange to suppose that Congress, in adopting a term broad enough to cover all competitive imbalances which might arise, intended that the Commission should make common carriers for hire out of private pipe lines whose services were unused, unsought after, and unneeded by independent producers, and whose presence fosters competition in markets heavily blanketed by large "majors." Such a step would at best be pointless; it might well subvert the chief purpose of the Act.

Yet on the record before us, this is precisely what the Commission is attempting to do. Unlike the crude-oil gathering lines of Valvoline, which carried the products of over 3,800 independent owners and operators, Cham-

plin's refined-products line carries only its own.[5] The Government concedes that the order under § 6 carries a necessary implication that Champlin may now be forced to devote its pipe line, at least partially, to public use. Nevertheless, the Commission has not only failed to disclose circumstances which the Act was passed to correct, but has either assumed or made findings to the contrary. In addition to findings previously referred to, the Commission stated as follows:

> "Only about 1.98 percent of the total gasoline consumed in [Champlin's marketing] area is moved through the pipe line and sold from respondent's terminal storage facilities. . . . The total capacity of the common-carrier lines into the Nebraska market is about 13 times that of the Champlin line and about 10 times that of the latter into the Iowa market. The common-carrier pipe-line capacity available to refineries in Oklahoma and Kansas aggregates 172,800 barrels a day [in contrast to Champlin's capacity of 9,800 barrels], and respondent's pipe line is the small-

---

[5] Champlin is sole owner of the stock of the Cimarron Valley Pipe Line Company, an intrastate crude-oil gathering system which supplies oil from both its own and others' wells to the Champlin refinery. However, the Commission both in this case and in *Champlin I* gave no consideration, either in the hearings or the orders, to Champlin's gathering facilities.

In any event, it would seem that Champlin's exclusive ownership of the *refined-products* line would be of no concern to independent *crude-oil* producers unless the following assumptions were true: (a) that independent refiners were shut out of gasoline markets which they would otherwise enter; (b) that this reduced their output below the capacity of their refineries; (c) that this decreased their demand for crude oil, thus reducing their competition with Champlin in the purchase of crude, and thus depressing the price which crude-oil producers could get. As to the first, and crucial, assumption, the Commission found precisely to the contrary. See text, *infra*.

est of any common-carrier or private pipe line oper-
ating in this territory. Apparently, *common-carrier
pipe-line transportation is available to any small
refiner in this area desiring such transportation.*

. . . . .

"So far as appears, no other pipe-line company has
threatened to force . . . a connection [with Cham-
plin's], and because of the *ample common-carrier
pipe-line facilities available, as revealed by respond-
ent, no refinery would be likely to interest itself in
such a connection.*" 274 I. C. C. 412–413, 415 (1949).
(Emphasis supplied.)

The court below, in its Findings of Fact, concluded that
"Champlin does not have a monopoly or any power to
establish a monopoly either in the transportation of pe-
troleum products into the trade territory or in the sale
of petroleum products therein." It further found that
"Champlin . . . is a small company in comparison with
companies with which it competes in the area reached by
its pipe line. . . . Champlin's acts create competition."
See also Chairman Splawn, dissenting from the Commis-
sion report. 274 I. C. C. 416.[6] The Government seeks to
rebuild its case by pointing to small refiners who are closer
to Champlin's pipe line than to any other, and by stressing
the expense of building long connecting lines. But there
is no evidence that any of these refiners wish to market

---

[6] ". . . [T]he evidence is clear that there has been, and is, no
holding out by Champlin of a common-carrier service either directly
or indirectly. None of the products moved through the line has ever
been purchased from any other interest. Moreover, the evidence
shows that the products transported through Champlin's pipe line
constitutes an inconsequential part of the total volume of products
that moves by pipe line to the consuming territory served by Cham-
plin from its storage facilities.

"Requiring Champlin to comply with our valuation orders and the
requirements of section 20 of the act . . . is one thing, but to require

outside their immediate area. And in any event, it is not the function of this Court to rescue the Commission by making findings *de novo* which the Commission itself was unable or unwilling to make. We hold that on this record the Commission's order, insofar as it concerns § 6, goes beyond what Congress contemplated when it passed the Act.

The judgment below will be modified by striking out those portions setting aside the Commission's order in Cause No. 29912, *Champlin Refining Company Accounts and Reports,* and as modified, it is affirmed.

*So ordered.*

MR. JUSTICE FRANKFURTER, while joining the Court's opinion, would overrule the earlier *Champlin* decision, 329 U. S. 29, on the ground set forth in the dissent in that case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE REED and MR. JUSTICE BURTON concur, concurring in part and dissenting in part.

The term "common carrier" has but one meaning in the Act—the meaning given it by § 1. That definition was held in *Champlin Refining Co. v. United States,* 329

---

it to file tariffs and thereby obligate itself to transport oil products of others in common-carrier service, to the exclusion of its own, is something entirely different.

.        .        .        .        .

"The purpose of the amendment in 1906 was to protect small independent producers from monopoly power. This report construes that amendment so as to convert into a common carrier the pipe line wholly owned and completely utilized by a relatively small independent company, though the company is wholly dependent upon such facility . . . in the conduct of its refining business. *This ultra literal construction regardless of differing conditions and circumstances* might well have the effect of destroying small independent companies instead of affording them the protection intended by the amendment." (Emphasis supplied.)

U. S. 29, sufficiently broad to include appellee. Section 19a was involved there and § 6 is involved here. That may make a constitutional difference; but there can be none so far as the statute is concerned. Since § 6, like § 19a, can reach appellee only through § 1, if § 1 is broad enough for the one section it is broad enough for the other. As the Court in its several decisions has not been consistent in its interpretation of the scope of the Act as applied to private pipe lines, I feel free to follow the precedent of the *Pipe Line Cases,* 234 U. S. 548, 561–562, and the view expressed in the dissent in *Champlin Refining Co.* v. *United States,* 329 U. S. 29, that pipe lines carrying only the commodities of their owners from the owners' refineries to the owners' storage tanks for marketing have not been made by Congress subject to the Act. Consequently, I agree that § 1 is not broad enough to bring appellee under the regulatory power of the Interstate Commerce Commission. Therefore, neither § 6 nor § 20 applies.

MR. JUSTICE BLACK, dissenting.

From whatever angle this case is approached, it seems to me that the holding of the Court is wrong. The decision rides roughshod over clear statutory language making the Hepburn Act [1] applicable to interstate oil-carrying pipe lines, and makes impossible enforcement of the Act as Congress intended. The decision undercuts and I think overrules several prior cases without mentioning

---

[1] 34 Stat. 584. The Hepburn Act was passed in 1906 as an amendment to the Interstate Commerce Act of 1887, 24 Stat. 379, and may now be found in 49 U. S. C. §§ 1–27. All quotations in the text follow the original language of the Hepburn Act, this Court twice having held that subsequent minor modifications changed neither the purpose nor the meaning of the Act. *Valvoline Oil Co.* v. *United States,* 308 U. S. 141, 145–146; *Champlin Rfg. Co.* v. *United States,* 329 U. S. 29, 32, note 4.

this fact. And this appellant, Champlin, is even given a second trial and victorious relitigation of the same issues we had previously determined against it. Finally, the opinion suggests to me that the Court accepts what I deem to be a frivolous constitutional challenge to the Act, namely that Congress is without power to force oil-carrying interstate pipe lines to serve as common carriers for hire.

## I.

The Court's holding that Champlin must comply with § 20 of the Hepburn Act, but need not comply with § 6, cannot be reconciled with clear language in those sections or with our previous decisions construing the same language. Section 20 authorizes the Interstate Commerce Commission to require that "all common carriers subject to the provisions of this Act" [2] file, among other things, certain annual reports; § 6 commands that "every common carrier subject to the provisions of this Act" [3] shall file schedules of rates with the Commission. I do not understand why it should be necessary to labor the obvious—this language requires Champlin (if it is a "common carrier subject to the . . . Act") to comply with § 6 if it is required to comply with § 20, or to comply with § 20 if it is required to comply with § 6. The Court holds that Champlin is a "common carrier subject to" the Act, and accordingly sustains the Commission's order to file reports under § 20. Paradoxically, however, it then proceeds to hold that the same Champlin, though "subject to" the Act, need not comply with § 6. How the Court

---

[2] 34 Stat. 593, now 49 U. S. C. § 20, which provides that the I. C. C. may require reports "from carriers" and ". . . the term 'carrier' means a common carrier subject to this chapter . . . ."

[3] 34 Stat. 586, now 49 U. S. C. § 6: "Every common carrier subject to the provisions of this chapter shall file . . . ."

gives the identical language in the two sections such different meanings is left a mystery.[4]

The Court may be saying that § 6 is something *sui generis*, that no pipe-line company need comply with that section unless it is something more than a "common carrier subject to the . . . Act."[5] While the meaning of this "something more" is not made clear, the Court, in overturning the Commission order does suggest in passing that it might possibly sustain an order requiring Champlin to comply with § 6 upon Commission findings that the company exploited "a competitive advantage simply by refusing to deal with independent producers having no comparably cheap method of reaching consuming markets" or that Champlin enjoyed a "monopoly" position in its area. Certainly nothing in the Hepburn Act should encourage such judicial creativeness for § 6 applies to "every common carrier subject to the . . . Act" in language which does not logically admit of limiting the section's coverage to carriers that have refused "to deal with independent producers" or achieved "monopoly" status. That § 6 would or could be thus restricted was not hinted at in the *Pipe Line Cases*, 234 U. S. 548 (where this section was involved), nor in *Valvoline Oil Co. v. United States*, 308 U. S. 141,[6] nor in our decision in the first *Champlin* case, *Champlin Rfg. Co. v. United States*,

---

[4] The mystery is not lessened by the Court's use of the concept of the "Commission's jurisdiction" in connection with tariffs. For the duty of a common carrier to file tariffs is not dependent on any "jurisdiction" or any order of the I. C. C. Section 6 unequivocally commands that common carriers subject to the Act "shall file." See note 3, *supra*.

[5] I am unable to find any support for this interesting theory in the language or history of any part of the Act, or from any other source. But see Splawn, Commissioner, dissenting, 274 I. C. C. 416; compare the opinion of Commissioners Aitchison, Splawn and Alldredge in the first *Champlin* case, 49 Val. Rep. (I. C. C.) 463.

[6] See Part III, *infra*.

329 U. S. 29.[7] It should be noted that the dissenting justices in *Champlin I* thought that an additional "something" was necessary before the Hepburn Act was applicable; they believed that *none* of the Act's provisions should apply to pipe-line companies unless they were "common carriers in substance." But neither those justices nor anyone else, so far as I know, have ever before suggested that the Court can pick and choose sections into which additional requirements can be imported. This possibility remained for today's majority to discover, 46 years after passage of the Hepburn Act.[8]

## II.

Far more important than the judicial exemption of Champlin from filing papers under § 6, however, is the Court's holding that pipe-line companies engaged in inter-

---

[7] The holding of the last two cited cases was that Valvoline and Champlin had to comply with 49 U. S. C. § 19a (a) and (e). Section 19a, like § 6 and § 20, applies to "every common carrier subject to the provisions of this chapter . . . ."

[8] I do not think that the Court in *Champlin I* reserved "as an independent *statutory* issue on a proper record" (emphasis added) the question whether Champlin could be converted into a public carrier for hire; rather the question left open was whether the Fifth Amendment barred converting Champlin into a public carrier.

Of course, the Government argued in *Champlin I,* as it did in *Valvoline,* that the Act's provisions should be treated as "separable" in passing on the *constitutional* question raised. But the Government has never intimated that the sections of the Act as a matter of *statutory* construction were "separable." Even an assumption that the sections were separable, however, would not justify the Court in exempting Champlin from § 6 unless it could find support for such an exemption in some statutory language. The Court has pointed to no such exclusionary language; I can find none. Moreover, as an Appendix to this opinion, *infra,* p. 315, shows, Senator Lodge intended to make "the pipe lines and the oil companies subject to all the provisions of the bill" unless expressly excluded in a particular provision.

state transportation of their own petroleum products need not act as public carriers for hire unless they have already voluntarily become "something more" than interstate oil-carrying pipe lines. The proper answer to this basic question in the case turns on § 1 of the Hepburn Act: "[T]his Act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity . . . by means of pipe lines . . . who shall be considered and held to be common carriers within the meaning and purpose of this Act . . . ." [9]

That Champlin is a common carrier within the literal language of this provision is shown by the unchallenged findings of fact made by the I. C. C.: Champlin, a fully integrated company, produces, refines, transports and markets petroleum products. Through a wholly owned subsidiary it also buys, gathers and transports to its refinery oil produced from the wells of others.[10] Its trunk pipe line extends 516 miles across five states from its refinery at Enid, Oklahoma, to its terminal at Rock Rapids, Iowa. Although application of the Act does not depend on a pipe-line company's size, Champlin is by no means a small company; rather, it occupies an important position in the area it serves.[11] But for the Court's hold-

---

[9] 34 Stat. 584, now 49 U. S. C. § 1: "(1) . . . The provisions of this chapter shall apply to common carriers engaged in— . . . (b) [t]he transportation of oil or other commodity . . . by pipe line . . . . (3) . . . (a) The term 'common carrier' as used in this chapter shall include all pipe-line companies; . . . ." See note 1, *supra*.

[10] Mr. A. G. E. Leverton, Comptroller of the Champlin Refining Company, testified: "We have never produced more than approximately 45 percent of the crude oil required by our refinery and hence have always been compelled to purchase on the open market, more than half of our crude oil requirements. . . ."

[11] The total cost of Champlin's pipe line and appurtenant facilities as of December 31, 1940, was $3,189,028.66. Champlin, according to the I. C. C., owns: (1) Approximately 149 oil wells on 53 leases

ing, I should have thought that § 1 of the Act on the admitted facts obviously required Champlin to serve as a common carrier for the products of others.

That the Hepburn Act did convert Champlin into a public carrier for hire is made even clearer by the legislative history. The pipe-line provision was sponsored in 1906 by Senator Henry Cabot Lodge of Massachusetts who offered to amend a pending railroad bill in a manner which would convert interstate oil-carrying pipe lines into common carriers subject to regulation by the I. C. C.[12] The Lodge Amendment reflected dissatisfaction with monopoly conditions in the petroleum industry. Such conditions, it was thought, had been brought about in the main through control of oil-carrying pipe lines by large integrated companies (especially the Standard Oil Company) which were using their control to exclude independent producers and refiners from this cheap transportation facility.[13] But the ensuing debate left no room for

---

in Oklahoma, 45 wells on 13 leases in Kansas, and 52 wells on 10 leases in Texas; (2) approximately 75,000 acres of undeveloped leases; (3) the Enid refinery which processes approximately 4½ million barrels of crude oil annually; (4) all the stock of the Cimarron Valley Pipe Line Company which owns and operates 450 miles of gathering lines in Oklahoma; (5) 723 tank cars; (6) approximately 316 filling stations and 248 gasoline and oil bulk plants; (7) the products pipe line involved in this case; (8) trucks and other equipment used to promote the producing, purchasing and refining of crude oil and the marketing of the products thereof. 49 Val. Rep. (I. C. C.) 463–464; 274 I. C. C. 410.

[12] The "pipe line provision" was added to § 1 of the Hepburn Act and is the language quoted from § 1 in the text accompanying note 9, *supra*. That provision is now found in 49 U. S. C. § 1. See note 9, *supra*.

[13] Immediately before Senator Lodge introduced his amendment, President Theodore Roosevelt transmitted to the Congress a report on the transportation of petroleum. 40 Cong. Rec. 6358. The report pointed out the advantage possessed by Standard Oil as a result of its control of pipe lines. H. R. Doc. No. 100, 59th Cong., 1st

308

doubt that the purpose of the Amendment, as its language clearly showed, was to deprive any oil company, not merely Standard,[14] of power to utilize pipe-line control to crush competition. To this end, as is shown by an Appendix following this opinion, the Amendment was designed to make public or common carriers for hire out of *every* private pipe-line company transporting petroleum products in interstate commerce. Senators who were opposed charged that the passage of the Amendment would do exactly this against the will of "private" carriers. Lodge and other proponents freely admitted it, explaining that anything less would be ineffective. All *congressional* efforts to narrow the Amendment to cover only companies already acting like common carriers were defeated.

Sess. 29, 36–37, 60–62, 398–400. For the background of monopolistic practices in the petroleum industry at that time, see generally Beard, Regulation of Pipe Lines as Common Carriers (1941), 10–27; 2 Sharfman, The Interstate Commerce Commission (1931), 59, 96; Whitesel, Recent Federal Regulation of the Petroleum Pipe Line as a Common Carrier, 32 Cornell L. Q. 337, 341. For history of Standard Oil practices, see *Standard Oil Co.* v. *United States*, 221 U. S. 1; *United States* v. *Standard Oil Co.*, 173 F. 177; Tarbell, The History of The Standard Oil Company (1925).

Control of pipe-line transportation is still important today. See, *e. g.*, the statement of Alfred M. Landon: "Very little crude oil is moved in any other way than by pipe line. There is only a small amount moved by intrastate shipments. The independent producer therefore finds himself at the mercy of his competitor in the business of producing oil when that competitor controls practically one hundred per cent of the transportation facilities, because it becomes simply a question of bookkeeping as to the end of the business in which this big monopoly shows its profit. It can pay less for the oil and make its profit from the transportation. The independent refiner is choked also by this same means—the control of the transportation facilities." Hearings before House Committee on Interstate and Foreign Commerce on H. R. 16695, 71st Cong., 3d Sess. 59.

[14] As to the danger involved in interpreting this Act as aimed at a single corporation, see *McFarland* v. *American Sugar Co.*, 241 U. S. 79.

Therefore it is strange to say, as the Court does, that applying the pipe-line provisions so as to make Champlin a common carrier for hire would "subvert the chief purpose of the Act." Stranger still is the Court's unexplained apprehension that requiring all interstate pipe-line companies to serve as public carriers for hire would somehow "foster" monopoly.

## III.

The Court, without mentioning it, necessarily overrules one or more of our previous decisions construing the Hepburn Act. In the *Pipe Line Cases, supra,* it was held that the Hepburn Act converted into common carriers for hire all private pipe-line companies "engaged in the transportation of oil or other commodity" across state lines, a decision which meant that all such companies are by law required to offer their services to the public.[15]

---

[15] Justice Holmes wrote for the Court: "The provisions of the act are to apply to any person engaged in the transportation of oil by means of pipe lines. The words 'who shall be considered and held to be common carriers within the meaning and purpose of this act' obviously are not intended to cut down the generality of the previous declaration to the meaning that only those shall be held common carriers within the act who were common carriers in a technical sense, but an injunction that those in control of pipe lines and engaged in the transportation of oil shall be dealt with as such." 234 U. S. at 559–560.

Both the Interstate Commerce Commission and the Commerce Court had construed the statute as requiring all interstate, oil-carrying pipe lines to serve as common carriers for hire. 24 I. C. C. 1 (1912); 204 F. 798 (1913). It is true that the Commerce Court held the Hepburn Act unconstitutional as a taking of property without due process of law, one judge dissenting. But on appeal, *Pipe Line Cases,* 234 U. S. 548, this Court reversed, holding the Act constitutional: As to those pipe lines in existence before passage of the Act, one ground assigned by the Court was that they were already common carriers in substance. As to pipe lines built subsequent to the passage of the Act, see Part V, *infra.*

In the first *Champlin* case, *supra,* we determined that this appellant was so "engaged." [16] Consequently, today's decision allowing Champlin to refrain from filing tariffs under § 6 necessarily overrules either the *Pipe Line Cases* or *Champlin I,* or both. If they are to be overruled, the Court should say so. I would not overrule either.

Nor do I understand how today's holding can be reconciled with *Valvoline Oil Co.* v. *United States, supra,* where we held that Valvoline was a "common carrier subject to" the Act. The pattern of operations of Valvoline and Champlin are identical with two minor exceptions: (1) Valvoline's interstate pipe lines transported crude oil while Champlin's trunk line transports gasoline. This difference is immaterial; even assuming that "gasoline" is not "oil" within the meaning of § 1, that section makes the Act apply not merely to any pipe-line company carrying "oil" but to pipe-line companies carrying any "other commodity." (2) Valvoline chose to operate its gathering lines and purchase oil from independent producers in its own corporate name while Champlin chooses to operate its gathering lines and purchase oil in the name of a wholly owned subsidiary. The Court, however, had no difficulty in the *Pipe Line Cases* in treating as a single unit the Standard Oil Company and its wholly owned or even partly owned subsidiaries.[17]

It should be noted, moreover, that Valvoline unsuccessfully made the same contention that the Court now

---

[16] 329 U. S. at 34. In the *Pipe Line Cases, supra,* the Uncle Sam Oil Company, which operated its business on the border between Oklahoma and Kansas, was held not to be so "engaged" because it was "simply drawing oil from its own wells across a state line to its own refinery for its own use, and that [was] all . . . ." 234 U. S. at 562. There is no *Uncle Sam* problem in this case since a majority of the Court today reaffirms the former holding that Champlin is "engaged in transportation."

[17] But cf. *United States* v. *Elgin, J. & E. R. Co.,* 298 U. S. 492; *United States* v. *South Buffalo R. Co.,* 333 U. S. 771.

accepts in order to relieve Champlin from its statutory duties. Thus, Valvoline attempted to avoid becoming a common carrier for hire by claiming that the Act applied only to companies enjoying a monopoly position in an area, a position not held by Valvoline because public pipe lines for hire adequately served the fields where Valvoline bought its oil.[18] The I. C. C. refused to accept Valvoline's proposed interpretation of the Act, and we necessarily did the same in affirming the Commission's order.

The Court nevertheless seeks to distinguish the *Valvoline* case on the ground that Valvoline "carried the products of over 3,800 independent owners and operators." The quoted language correctly states a fact only if it is understood to mean that Valvoline made purchases from 3,800 independents and then carried the purchased oil in its pipe line. This fact, however, certainly does not distinguish the two cases. Like Valvoline, Champlin carries the "oil of others" all the way from the well to the market area: over half of the oil and gasoline carried by Champlin is originally purchased as crude oil from independent producers in the field before transportation begins.[19] As noted above, Champlin does make these purchases through a wholly owned subsidiary, rather than in its own corporate name, but this fact is unimportant.[20]

---

[18] As to the factual similarity between Champlin's and Valvoline's domination (or lack of domination) in the fields served, compare 274 I. C. C. 413 ("[a]pparently, common-carrier pipe-line transportation is available to any small refiner in [Champlin's] area desiring such transportation") with 47 Val. Rep. (I. C. C.) 534, 535 ("[a]t least one common-carrier pipe-line company serves each of the fields reached by the Valvoline").

[19] See note 10, *supra*. Whether Champlin buys from more or less than 3,800 independent producers does not appear in the record. But the exact number cannot have legal significance here. See *Valvoline Oil Co.* v. *United States*, 308 U. S. 141, 147.

[20] Even if Champlin produced all the oil it transported, the Act would require its regulation because of the effect of exclusive pipe-

312

Since there is no substantial difference between the operations of Champlin and Valvoline, and between the legal arguments made in the two cases, I conclude that, verbalisms aside, the effect of today's decision is to undermine the *Valvoline* holding. In this situation I think *Valvoline* should be expressly overruled. Why, in fairness, should Valvoline and others similarly situated be required to serve as common carriers for hire while Champlin is left free to conduct its pipe lines as it chooses?

## IV.

In the first *Champlin* case we upheld findings of fact made by the I. C. C., 49 Val. Rep. (I. C. C.) 463, 470, that appellant was "engaged in transportation" and was "a common carrier subject to the provisions of" the Act. Since these questions were "distinctly put in issue and directly determined," Champlin may not dispute them in this second proceeding between the same parties unless there is a departure from the principles most recently announced in *United States* v. *Munsingwear*, 340 U. S. 36,

line ownership on Champlin's price policy at the other end of the pipe line. For one major purpose of the Act was to insure competition in the petroleum industry by regulating pipe-line transportation so that the independent refiner, the jobber and the consumer would not be charged exorbitant prices by the integrated companies. See 40 Cong. Rec. 6365, 6366; Note, Public Control of Petroleum Pipe Lines, 51 Yale L. J. 1338, 1347–1348. It is noteworthy that the price of Champlin's gasoline was ⅛¢ per gallon higher at Superior, Kansas (a point not served by any other common carrier pipe line), than it was at Rock Rapids, Iowa (a point served by a common carrier line, hence in a competitive market); Rock Rapids is 260 miles further from the Enid refinery than is Superior. The effect of such control was pointed out long ago by this Court in *Standard Oil Co.* v. *United States,* 221 U. S. 1, 77, as follows: "As substantial power over the crude product was the inevitable result of the absolute control which existed over the refined product, the monopolization of the one carried with it the power to control the other . . . ."

38.  Yet three concurring justices today appear to take
the position that Champlin is not "engaged in transporta-
tion," and is therefore not a common carrier subject to the
Act, a position which this Court emphatically rejected in
*Champlin I.*  I also believe that the majority's position
is unjustified under the *Munsingwear* principle when the
effect (as distinguished from the language) of their deci-
sion is considered.

## V.

Why should the Court interpret the Hepburn Act in a
way which nullifies its purpose?  I am forced by process
of elimination to consider whether the decision reflects
either a hostility to the policy of the Act or an unarticu-
lated belief that it is unconstitutional, if enforced as writ-
ten.  Neither this Court nor any other should strangle
an Act because of judicial disagreement with congressional
policy.  If destruction of the Act results from a feeling
that the Constitution forbids Congress to convert private
companies into public servants, I think that this view
should be announced here, as it was by a majority of the
court below.  Pipe-line companies, administrators of the
law, the bench, the bar, and the Congress are entitled
to no less.  Of course, the same constitutional contention
was expressly rejected in 1914 in the *Pipe Line Cases,*
*supra:* As to companies which, like Champlin, built their
lines after passage of the Act, Justice Holmes, speaking
for the Court, dismissed the challenge brusquely with
less than a sentence, stating merely that "there can be
no doubt that it [the pipe line provision] is valid."  234
U. S. at 561.  Again, in 1922, the Court, relying on the
*Pipe Line Cases, supra,* rejected a somewhat similar con-
stitutional argument as "futile to the point almost of
being frivolous."  *Pierce Oil Corp.* v. *Phoenix Rfg. Co.,*
259 U. S. 125, 128.  Surely a contention deemed "almost
frivolous" twenty-nine years ago should not now be
reinvigorated by implication.

## VI.

No one can be sure that under the Act as now rewritten by the Court the Commission can or should succeed in forcing any oil company—even those now complying with the Act—to carry gasoline or oil for others as a common carrier. Even without the newly engrafted, Court-created hurdles, the pipe-line provisions, for one reason or another, have never been enforced as effectively as might be desired.[21] Perhaps, therefore, no great harm will result from the Court's polite but sure frustration of the Hepburn Act's purpose. Some people in and familiar with the oil industry, however, believe that this Act should be strengthened, not weakened.[22] Be that as it may, I deem it my duty to vote to enforce the Act as Congress has passed it.

I would reverse.

---

[21] "The major oil companies have their greatest control in the transportation of crude oil. . . . The control of transportation today by the majors appears in many respects to be just as complete and effective as was the case of the Standard Oil Trust." Report of the Temporary National Economic Committee, 76th Cong., 3d Sess., Monograph 39 (1941), p. 28. This report contains an excellent discussion of transportation problems in the petroleum industry. *Id.* at 19–28. And see Kemnitzer, Rebirth of Monopoly (1938), 78–95; Whitesel, Recent Federal Regulation of the Petroleum Pipe Line as a Common Carrier, 32 Cornell L. Q. 337, 355–369.

[22] See, *e. g.,* the statement of Alfred M. Landon: "The crushing strength of the old Standard Oil Co. lay in the fact that, of its thirty-odd companies, some were producers only, some were transporters only, some were refiners only, and some were marketers only.

"But the master minds that controlled the old Standard Oil Co. coordinated these thirty and odd companies into one vast company— a great single, integrated, coordinated 'unit' that, as a corporate entity, did all of these things (producing, transporting, refining, and marketing)—and all of them within the corporate inclusiveness of 'one' company.

"Therein rested the terrific, the overpowering strength of the old

APPENDIX TO OPINION OF MR. JUSTICE BLACK.

On May 4, 1906, President Theodore Roosevelt transmitted to the Congress a report describing and condemning various monopolistic practices in the petroleum industry.  40 Cong. Rec. 6358.  Senator Lodge of Massachusetts on the same day introduced an amendment to § 1 of the Hepburn Act making pipe-line companies engaged in the interstate transportation of oil and other commodities common carriers:

> "[That the provisions of this act shall apply to] Any corporation or any person or persons engaged in the transportation of oil or other commodity, except natural gas or water for municipal purposes, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, who shall be considered and held to be common carriers within the meaning and purpose of this act . . . ."  *Id.* at 6361.

---

Standard Oil Co.
"To-day, from a corporate standpoint, we have the 'equivalent,' many times over, of the old Standard Oil Co. . . .

.        .        .        .        .

"It is inevitable that the only escape from monopolistic domination in the oil industry—and it is being rapidly accomplished through mergers and integration—is to clearly, definitely, and effectively segregate, first, the entire pipe line transportation system of the oil industry from the rest of the industry.  The first effect of this segregation would be the substitution of competition in the transportation of crude oil for the present practice which, in each individual case, is, to all practical purposes, a monopoly."  Hearings before House Committee on Interstate and Foreign Commerce on H. R. 16695, 71st Cong., 3d Sess. 60, 61.  For views against the proposed strengthening of the Hepburn Act, see House Report on Pipe Lines, 72d Cong., 2d Sess. (1933), especially Special Counsel Splawn's conclusions, p. lxxviii.. See also Kemnitzer, Rebirth of Monopoly (1938), 87–90; F. R. Black, Oil Pipe Line Divorcement by Litigation and Legislation, 25 Cornell L. Q. 510.

Senator Foraker of Ohio immediately objected to the broad scope of the Lodge proposal: "I do not want to make any opposition to the Senator's amendment, but it occurs to me that the amendment ought to be further amended, so as to provide that it shall apply only to pipe lines operated for the public. I do not understand how you would compel a man who has a private pipe line of his own to become a common carrier. . . . I think such a limitation ought to be put in the Senator's amendment by an amendment to the amendment that it shall apply to all pipe lines that are carrying for the public, and not to private pipe lines that an individual or a single corporation may have laid down and put into operation for its own benefit." *Id.* at 6361.

Senator Nelson in reply stated that Foraker's suggestion would "practically nullify the provision, because every one of these pipe lines can say 'we refuse to do business for the public.' Practically the [Lodge] amendment would be of no use at all." *Id.* at 6365. And Senator Lodge added: "[T]he amendment suggested by [Senator Foraker] to the effect that no pipe line, unless it carries for the public, shall come under this rule, will, as [Senator Nelson] says, absolutely destroy the value of my amendment." *Id.* at 6365.

During the course of the debate an attempt was made to make the Lodge amendment applicable only to carriers "for the public" or to "transportation for hire" or "for compensation," but it was unsuccessful. *Id.* at 7000. Senator Lodge again stated that such an amendment would "absolutely destroy" his proposal "so far as its effectiveness is concerned." *Id.* at 7000.

There can be no doubt but that the proponents knew and stated their purpose. Senator Lodge declared: "[T]he purpose of this amendment is to bring the transportation of oil and other commodities within the inter-

state-commerce law. Oil is one of the greatest articles of
interstate commerce carried in this country, and it is now
absolutely outside and beyond any Government regula-
tion whatsoever." *Id.* at 6365. Later he added: "All
pipe lines owned by any company within the United
States . . . are made common carriers." *Id.* at 7001.
Senator Clay, speaking about the pipe-line provision, ob-
served: "This bill makes every corporation engaged in the
transmission of oil a common carrier. Every private cor-
poration transmitting its own oil . . . is made a common
carrier by the [Lodge] amendment . . . ." *Id.* at 7009.
And Senator Culberson said: "Nothing is left to the
courts for construction, but the statute itself declares
that any corporation, or any person or persons engaged
in transporting oil by pipe lines—of course, as interstate
commerce—are common carriers, and are declared to be
such in this act of Congress, subject to the authority of
this act . . . ." *Id.* at 7005. Senator Bailey, in the final
debate on the measure, described the Lodge proposal
as the " 'pipe-line amendment,' by which we mean the
amendment that makes the pipe lines common carriers."
*Id.* at 9647.

The "commodities clause" of the Hepburn Act was de-
signed to prevent railroads from owning businesses whose
shipments they carried. When that clause was first con-
sidered in the Senate, it applied to "common carriers
subject to" the Act. Some senators realized that the
"commodities clause"—read together with the Lodge
Amendment making every pipe-line company subject to
the Act—would force a divorcement of pipe lines from
refineries. To avoid this, they again suggested that the
Lodge proposal be amended so as to apply only to pipe
lines operating for the public. Senator Lodge said:
"What I want to suggest to the Senator is that this
[original Lodge] amendment makes the pipe lines and

the oil companies subject to all the provisions of the bill. If the Senator thinks there is an injustice, the place to remedy it is on page 5, at that amendment [the commodities clause], and not at this one [the Lodge amendment]." *Id.* at 7009. Accordingly, the "commodities clause" finally passed by Congress referred specifically to railroads. 34 Stat. 585.