**Mark M. AKINS et al.**
v.
**The UNITED STATES.**
No. 46–68.

United States Court of Claims.
March 19, 1971.

Jeffrey M. Glosser, Washington, D. C., attorney of record, for plaintiffs; N. Alfred Pasternak, Washington, D. C., of counsel.

Judith A. Yannello, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS and SKELTON, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge.

Plaintiffs were employees of the National Capital Transportation Agency (hereinafter NCTA) which was created on July 14, 1960, as a temporary Federal agency to aid in coordinating the transportation systems in the Washington Metropolitan area.[1] The same law which created this agency authorized the States of Maryland and Virginia and the District of Columbia to organize a permanent instrumentality which would undertake the same functions as the NCTA. Pursuant to this authority, a public non-Federal agency, the Washington Metropolitan Area Transit Authority (hereinafter WMATA) was created by an interstate compact, with the prior consent of Congress.[2] The assets and liabilities of the NCTA were transferred to the WMATA by means of Executive Order No. 11373, dated September 20, 1967,[3] and the former agency was abolished on September 30, 1967. Plaintiffs had been previously notified that the "functions and duties" of the NCTA were being transferred to the WMATA, and that their employment with the former agency was being terminated. Subsequently, plaintiffs were offered employment with the WMATA, effective October 1, 1967, which was the business day immediately following their last day of employment with the NCTA. Each plaintiff accepted said offer and began employment with the new agency on that date.

Prior to their employment with the new agency, plaintiffs were notified that, upon their separation from Federal service, they would be entitled to receive severance pay. However, contrary to this notification, the Civil Service Commission (hereinafter CSC), on September 29, 1967, promulgated a regulation, 5 C.F.R. § 550.701(b) (5), which provides:

> This subpart [providing for severance pay benefits] does not apply to an employee of a department or a subdivision thereof who, when the department or a subdivision thereof is replaced by a public non-Federal organization created in whole or in part pursuant to an Act of Congress, is offered employment comparable to his employment in the department at the time of replacement, or within 90 days of the date of replacement accepts any employment, with the successor public non-Federal organization.

The clear intent and effect of this regulation was to exclude plaintiffs from receiving any severance pay benefits resulting from their separation from Federal service and their subsequent re-employment with a successor public non-Federal agency.

In response, plaintiffs filed this action, and the case comes before the court on defendant's motion and plaintiffs' cross motion for summary judgment.

We must decide whether plaintiffs were entitled to severance pay benefits by virtue of the legislation and implementing regulations in effect at the time they were separated from Federal service.

5 U.S.C. § 5595 (Supp. V 1965–1969) provides for the payment of severance pay to certain classes of Federal employees who are "involuntarily separated from the service, not by removal for cause on charges of misconduct, delinquency, or inefficiency * * *." To these general provisions, § 5595 enumerates a number of exceptions. Specifically, 5 U.S.C. § 5595(a) (2) (viii) (Supp. V 1965–1969) excludes from cov-

---

1. 40 U.S.C. § 651 et seq. (1964).

2. Congress granted its consent and approval for the States of Virginia and Maryland and the District of Columbia to enter into a compact related to the regulation of mass transit in the Washington, District of Columbia Metropolitan area on September 15, 1960, Pub.L.No. 86–794, 74 Stat. 1031.

3. C.F.R.1967 Comp. at 319.

erage "such other employee as may be excluded by regulations of the President or *such other officer or agency as he may designate.*" [Emphasis supplied]. By Executive Order No. 11257, dated November 17, 1965,[4] the President formally delegated the authority to make implementing regulations relating to severance pay under the Federal Employees Salary Act of 1965[5] to the CSC. Pursuant thereto, the CSC promulgated the severance pay regulation quoted above, 5 C.F.R. § 550.701(b) (5), which is now in issue. Thus there, is no doubt that this action of the CSC was within the periphery of a valid grant of authority, and that it pertained to a substantive area of law which was appropriate for administration by the Commission. Indeed, it is not the power which plaintiffs challenge, but the exercise of that power.

Plaintiffs contend that the regulation, which specifically excluded them from receiving severance pay upon their departure from the employ of the NCTA, is invalid because it is not in harmony with the principle or spirit of the Act, nor with prior CSC regulations which are interpretative of these identical severance pay provisions. Further, plaintiffs contend that the regulation does not give effect to the expressed Congressional intent upon which the Act is based.

■ For reasons which shall become apparent, we believe the reverse to be true and, accordingly, we hold that the severance pay regulation enacted by the CSC, 5 C.F.R. § 550.701(b) (5), is consistent with the Act and all prior implementing regulations, and is mindful of the Congressional intent and responsive thereto. Further, we hold that the regulation is not arbitrary or capricious, but is well within the discretionary authority of the CSC. It follows, of course, that plaintiffs were correctly denied all severance pay benefits.

■■ In expounding a statute, the court must be guided by the provisions of the whole law, its object and policy, and the purpose clearly manifested by Congress. Hudson Distributors, Inc. v. Eli Lilly Co., 377 U.S. 386, 84 S.Ct. 1273, 12 L.Ed.2d 394 (1964); Com'rs of Internal Revenue v. Bilder, 369 U.S. 499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962); NLRB v. Lion Oil Co., 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957); Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950); United States v. Congress of Industrial Organizations, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948); SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). A statute cannot be divorced from the circumstances existing at the time it was passed or from the evil which Congress sought to correct and prevent. United States v. Wise, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); CAB v. Delta Air Lines, Inc., 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1961); United States v. Champlin Refining Co., 341 U.S. 290, 71 S.Ct. 715, 95 L.Ed. 949 (1951). Although far from definitive, the legislative history of the Federal Employees Salary Act of 1965 does provide a certain degree of insight into the Congressional design which motivated passage, and it elucidates the type of problems the Act was intended to resolve.

The Act was passed in 1965 during a period in which the United States Defense Department instituted a long overdue economy drive. As part of that program, the Department was forced to shut down a large number of defense plants. One immediate consequence of that action was a sharp increase in the number of unemployed workers who were former Federal employees. Recognizing that the vast majority of these

---

4. 3 C.F.R.1964–65 Comp. at 357.

5. The severance pay provisions now codified in 5 U.S.C. § 5595 (Supp. V 1965–

1969) were originally enacted in the Federal Employees Salary Act of 1965, Pub. L.No.89–301, 79 Stat. 1111, 1118–20.

individuals could not be reabsorbed quickly into public or private industry, and feeling a certain responsibility to these former Federal employees who, together with their families, would now be confronted with great and, in some cases, unmanageable economic hardships, Congress wisely decided to provide a measure of relief. Toward that end, the 1965 Act was passed which provided for the payment of severance pay benefits upon involuntary separation from Federal service. The following statement of Congressman Addabbo of New York reflects the various expressions of Congressional intent which were forthcoming at the time the Act was passed:

> * * * We have entirely too many instances of family men who have given many years of faithful service to our Government losing their jobs, too young for retirement and with children, who have no immediate entitlement to benefits to cushion the impact until they can find employment. * * * [111 Cong.Rec. 25681 (1965)].

The majority House Report, accompanying the Act, stated that the severance pay provisions were intended to provide "reasonable compensation to help tide Federal employees over difficult transition periods" when they became separated from Federal service through no fault of their own. H.R.Rep. No. 792, 89th Cong., 1st Sess. 11 (1965).

This legislative history indicates that the express purpose of the severance pay provisions of the Act was to afford monetary relief to Federal employees who, after long years of faithful public service, "find themselves out in the cold without work and without retirement," and with the complete loss of earned employee rights. 111 Cong.Rec. 25677 (1965) (remarks of Congressman Hanley). We do not believe that Congress intended to mandate extension of coverage of the Act to an employee who is offered and accepts comparable employ-

ment with a successor public non-Federal agency at the same grade and at an equivalent or higher salary, and who does not miss one working day during the transitional period.

It is significant also that the Congressional grant of authority to the President or his designate is fashioned in very general terms. This conspicuous lack of direction suggests that Congress intended the President to act with broad discretion in order to provide for the expedient resolution of unforeseeable situations which would undoubtedly arise during the future administration of the Act. Indeed, we regard this case as one such unforeseeable situation because of the unique problems it raises. We are persuaded that Congress was concerned with precisely this type of circumstance when it entrusted the President or his designate with the discretionary authority to make the type of regulations hereabove described.

According to the Act and the implementing regulations, a Federal employee is excluded from receiving severance pay or payment is discontinued if, upon separation from Federal service, he accepts any further employment within the Federal Government, 5 U.S.C. § 5595(d) (Supp. V 1965–1969), or if he declines the offer of an *equivalent* position, "in his department in the same commuting area * * *." For purposes of that subparagraph, "an equivalent position is one of like seniority, tenure, and pay * * *." 5 C.F.R. § 550.701(b) (2). Plaintiffs interpret 5 C.F.R. § 550.701 (b) (5), which precludes the payment of severance pay if an offer of *comparable* employment is declined, as an unjust and inconsistent modification of the standard previously applied in severance pay cases. To facilitate this discussion, and in order to give plaintiffs every benefit of the doubt, we shall adopt plaintiffs' suggested definitions of the pertinent terms. Thus, for the purposes of this opinion, *equivalent* is defined as "* * * corresponding or virtually

identical * * *"; [6] whereas *comparable* is defined as "* * * having enough like characteristics or qualities to make comparison appropriate * *." [7] We agree that, as defined above, equivalent employment is more identical in its characteristics than comparable employment. However, our interpretation of the regulation makes this distinction, as it applies to the facts of this case, irrelevant.

When construing the language of a statute or an administrative regulation, we must follow the fundamental guidelines earlier expressed by the Supreme Court:

> * * * legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him. [Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944)].

*Accord:* NLRB v. Coca-Cola Bottling Co., 350 U.S. 264, 268–269, 76 S.Ct. 383, 100 L.Ed. 285 (1956).

The unequivocal language of the challenged regulation denies the payment of severance pay benefits upon the happening of either one of two separate and distinct events. That is to say, severance pay will be denied if any employment with the successor public non-Federal agency is accepted within 90 days of the date of replacement, *or* if a comparable position is offered at the time of replacement and subsequently declined. There is no dispute that plaintiffs have satisfied this first contingency by accepting employment with the WMATA within the prescribed period of 90 days. This action alone brought plaintiffs within the express terms of the regulation. Thus, the issue of comparability of employment, as it applies to these plain-

tiffs, is relevant only insofar as it relates to the offer of employment. In turn, the offer itself is relevant only if no employment is accepted within the prescribed period, or if the offer is accepted after the prescribed period of time. Undoubtedly, then, the action of the CSC, denying plaintiffs the severance pay they sought, was correct and appropriate under the circumstances of this case.

We note too that this rendition of the Commission regulation is completely harmonious with the intent and effect of the Federal Employees Salary Act of 1965 and the prior CSC regulation, as outlined above, which also deny severance pay upon the happening of one of two separate and distinct events, *i. e.*, the acceptance of any employment within the Federal Government *or* the declination of the offer of equivalent employment.

■ Plaintiffs' alternative argument is equally without merit. They contend that if we deny their motion for summary judgment, then there remains to be considered a genuine issue of material fact which would require further proceedings. That issue, according to plaintiffs, is the comparability of plaintiffs' prior employment with the NCTA and plaintiffs' subsequent employment with the WMATA. However, for the reasons stated above, the question of comparability of job functions and related benefits becomes moot once *any* employment with the successor public non-Federal agency is accepted within the prescribed time period. Only when the offer of employment is declined or accepted after this prescribed period does the issue of comparability become ripe for resolution. Accordingly, we hold that there remains no issue of fact yet to be decided.

The CSC was justified in making this distinction between an "equivalent" position and a "comparable" position. There is no doubt that certain differ-

---

6. Webster's Third New International Dictionary, unabridged 769 (G. & C. Merriam Co. 1967).

7. *Id.* at 461.

ences do inhere between Federal service and any other type of public or private employment. For example, the employee who is separated from his position with the Federal Government no longer enjoys the umbrella protection provided by the Civil Service System and other applicable Federal statutes and regulations. Therefore, the creation of an equivalency standard, as it applies to the comparison of employment within and without the Federal service, would be a meaningless act inasmuch as said standard *could never be satisfied.* As there can be no *equivalent* employment outside the Federal Government within the accepted and reasonable definition of that term, *i. e.,* "virtually identical", there can be no offer of such employment. An equivalency standard, therefore, can be applicable only to cases which involve a transfer entirely within the Federal service, in which it is theoretically and practically possible to offer the transferring employee an equivalent position. Such can never be the case when, as here, an employee transfers from a position with the Federal service to a position with a successor public non-Federal agency. Even though the non-Federal employment might offer advantages superior in many respects to Federal employment, it would still not be "equivalent" thereto. Thus, we believe that the CSC formulation of the *comparability* standard expressed in 5 C.F.R. § 550.701(b) (5) was borne not only of administrative innovation but of absolute necessity. As such, we regard it as a reasonable and valid exercise of administrative discretion.

Plaintiffs seek to attribute much importance to the passage of the Department of the Interior and Related Agencies Appropriations Bill for fiscal year 1968, Pub.L. No. 90-28, 81 Stat., 59, 74 (1967) (hereinafter H.R. 9029), which provided adequate funding for the payment of terminal leave and severance pay to any former NCTA employee who became entitled to such benefits. However, H.R. 9029 was a blanket appropriation which provided for the computed amount of anticipated terminal leave and severance pay for the *entire staff of the NCTA,* not only plaintiffs. A general provision was made necessary by the fact that, at the time the bill was passed, it was impossible to accurately determine the number of former NCTA employees who would eventually become entitled to severance pay. Indeed, it was the action of the individual at the time of actual separation which was finally determinative as to entitlement. For example, a number of former NCTA employees accepted immediate employment within the Federal Government. Consequently, they were justly deprived of any severance pay benefits by virtue of 5 U.S.C. § 5595(d) (Supp. V 1965–1969), notwithstanding the provision of H.R. 9029. Moreover, for identical reasons, any employee whose actions brought him within the prohibition of 5 C.F.R. § 550.701(b) (5), which we have held to be a valid CSC regulation, should similarly be deprived of the same benefits. This is the precise situation in which plaintiffs now find themselves.

■ Plaintiffs argue that the "entitlement of H.R. 9029 on June 24, 1967 [the date this bill was enacted into law], gave NCTA employees an inchoate right to severance pay which ripened upon their involuntary separation. from Federal service—irrespective of whether they accepted employment with WMATA." If this were true, it would naturally follow that *all* former employees of NCTA were entitled to severance pay, including those individuals who accepted further Federal employment. This result would negate not only the CSC regulation now in question but also the express terms and clear intent of the Federal Employees Salary Act of 1965, 5 U.S.C. § 5595 (Supp. V 1965–1969). We are certain that Congress never intended such a result.

Finally, we note that our decision is in complete agreement with the views expressed by the Comptroller General of the United States, who was asked to con-

sider the question of "whether severance pay will be payable to employees of the National Capital Transportation Agency when the functions of that agency are transferred to the Washington Metropolitan Area Transit Authority * *." Decision B–162581, September 28, 1967.[8] In our opinion, the Comptroller General correctly concluded that:

> * * * it would be within the authority of the Civil Service Commission, in the exercise of the discretion vested under section 9(b) (8) of Pub. L. 89–301, to issue a regulation excluding employees moving under a transfer of function from a Federal agency to a public non-Federal organization such as here involved from severance pay benefits, provided such regulation is issued and made effective prior to the date of the transfer of functions * * *.

We reiterate that the NCTA was created as a temporary agency with the full expectation that a permanent agency eventually would be established to assume the equivalent functions and responsibilities. Had the new agency been created within the structure of the Federal Government, there is every indication that there would have been a transfer of personnel as well. Nevertheless, plaintiffs were offered new employment with the WMATA at least two months prior to the abolition of the NCTA. The commencement of their new functions with the WMATA coincided exactly with the termination of their previous positions with the NCTA. Thus, they suffered no "hardships" of unemployment. They performed essentially the same functions, occupied the same grades, and were paid equivalent or, in some cases, higher salaries.

We have concluded that, under the circumstances of this case as outlined above, the Congressional intent would best be served by denying plaintiffs' severance pay benefits and by sustaining the CSC regulation as a valid exercise of duly authorized administrative discretion.

Accordingly, plaintiffs' cross motion for summary judgment is denied. Defendant's motion for summary judgment is granted and the petition is dismissed.

---

8. This decision was in response to a request by Senator A. S. Mike Monroney of Oklahoma who voiced opposition to the receipt of severance pay by plaintiffs on the floor of the Senate. 113 Cong.Rec. 27124–27125 (1967).